UNITED STATES of America, Appellee,

v.

MARTORANO, Raymond, a/k/a Lon John, Appellant.

No. 82–1401.

United States Court of Appeals, Third Circuit.

Argued Jan. 6, 1983.

Decided June 13, 1983.

Rehearing and Rehearing In Banc Denied July 8, 1983.

Pamela W. Higgins (argued), Higgins & Madden, Robert F. Simone, Philadelphia, Pa., for appellant.

Peter F. Vaira, Jr., U.S. Atty., Eastern District of Pennsylvania, Louis R. Pichini, Sp. Atty., Dept. of Justice, Philadelphia, Pa., William C. Bryson (argued), Dept. of Justice, Washington, D.C., for appellee.

Before ALDISERT, GIBBONS and HIG-GINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

**A. LEON HIGGINBOTHAM, Jr., Circuit Judge.**

Appellant challenges his conviction for possession of a controlled substance, phenyl-2-propanone (P–2–P), with intent to distribute it in violation of 21 U.S.C. § 841(a)(1). Appellant contends that the evidence at trial was insufficient to prove that he had possession of the P–2–P because the government never surrendered dominion and control over it and appellant therefore never had the ability to actually or constructively possess it. We reject appellant's contentions and will affirm the district court.

### I.

Raymond Martorano and two co-conspirators, John Berkery and Frank Vadino, were indicted for conspiring to distribute and to possess with intent to distribute P–2–P in violation of 21 U.S.C. § 846; they were also indicted for possession of P–2–P with intent to distribute it in violation of 21 U.S.C. § 841(a)(1).[1] Martorano was tried before a jury that found him guilty of the conspiracy and possession charges. The district court denied Martorano's post-trial motions for acquittal and for a new trial, *United States v. Martorano*, 541 F.Supp. 1226, 1230 (E.D. Pa.1982), and sentenced him to consecutive five-year terms of imprisonment followed by a three-year term of special parole. Martorano does not contest his conspiracy conviction. He challenges only his conviction under 21 U.S.C. § 841(a)(1) for possession of a controlled substance with intent to distribute it.

### II.

The facts of this case are uncontested. In June 1981 Martorano initiated[2] the purchase of 52 gallons of P–2–P from Ronald Raiton, a large distributor of P–2–P in the Philadelphia area. From October 1980 to June 1981, Raiton sold some 200 gallons of P–2–P to Martorano's co-conspirator, John

---

**1.** Berkery was indicted for nine counts of possession of P–2–P and four counts of possession of methamphetamine. He has not been tried on this indictment and is a fugitive. After his case was severed from Martorano, Vadino was tried without a jury and was found guilty of possession. He was sentenced to five years imprisonment.

**2.** The dissent obliquely characterizes this as a case of entrapment and gives the impression that Martorano was somehow "baited" into purchasing the P–2–P. Typescript at 1. The record demonstrates that such a characterization is erroneous. The dissent makes other factual misstatements and, in addition, focuses on irrelevancies. For example, it mentions that Raiton is "a notorious long-term professional criminal." *Id.* at 1–2. Martorano had had other illegal business dealings with Raiton before the purchase for which Martorano now stands convicted. Neither Martorano nor Raiton is a saint, but their notoriety is not an issue in determining possession of the P–2–P. The dissent asserts that the method of transferring the P–2–P was suggested by Raiton. Typescript at 4. However, the plan, including the method of transfer, was devised by Martorano. Appendix at 40–42. We also disagree with the dissent's assertion that Martorano had greater control over the P–2–P than "any other passerby in Rittenhouse Square," typescript at 6, because he and his agents had possession of the keys,

not "for a different vehicle," *id.* at 5, but for the vehicle containing the P–2–P, and not for "a different padlock," *id.,* but for the padlock that secured the P–2–P. Furthermore, no evidence was adduced at trial or during oral argument that suggested that the van was mechanically inoperative in any way as the dissent speculates might have been the case. *Id.* at 6 and fn. 1.

Finally, we are not advocating and we are unfamiliar with a "doctrine of constructive criminality" to which the dissent refers. Typescript at 8. This case concerns the meaning of constructive possession as it related to 21 U.S.C. § 841(a)(1). This case, like all criminal cases, must be analyzed in light of the applicable substantive statutes and cases. As a philosophical proposition, there is merit in the dissent's concern about the manipulative pyramiding of offenses arising out of a specific criminal transaction. However, it is not without significance that the dissent does not cite even one case in American law which supports its conclusion of law. In contrast, though perhaps not elegantly, we have attempted to analyze all of the relevant cases which establish the law and articulate the legal theories as to whether conduct does or does not constitute possession of a controlled substance with intent to distribute it. We think we are stating the law as it is, rather than articulating a jurisprudential theory not supported by the relevant statutes and case law.

Berkery, for which Martorano guaranteed payment. Unbeknown to Martorano and Berkery, Raiton became an undercover informant early in 1981. Martorano met with Raiton on two occasions, June 19 and July 1, 1981, to discuss the details of Martorano's prospective purchase of the P–2–P. The two men agreed to a plan devised by Martorano under which Raiton would rent a van, place the P–2–P in the van and park the van near Philadelphia's Rittenhouse Square. Raiton was then to meet Martorano in the Square at 1 p.m. on August 1, 1981 to turn over the keys and registration to the van in exchange for a paper bag containing payment for the P–2–P which would be given to Raiton by an agent of Martorano.

Pursuant to Martorano's plan, Raiton rented a van on July 28, 1981. However, he delivered the van to F.B.I. agents who loaded it with 52 gallons of P–2–P acquired from a federal storage facility in Florida. The F.B.I. agents placed a specially purchased padlock on the rear doors of the van. They drove the van to a location near Rittenhouse Square where they parked and maintained uninterrupted surveillance of the van.

The agents gave the keys to the van and the lock to Raiton and told him where the van was parked. Raiton then went to Rittenhouse Square and met Martorano as scheduled. After writing the location of the van on a piece of paper at Martorano's request, Raiton accompanied Martorano to a park bench in Rittenhouse Square where Vadino was sitting holding a shoebox containing $100,000. Martorano took the box from Vadino and handed it to Raiton; Martorano then gave Vadino the paper with the location of the van written on it and told Vadino to "check out" the van.

Vadino went with Marco DeTullio to inspect the van. In the meantime Raiton and Martorano completed the transaction in Rittenhouse Square. Martorano handed Raiton an additional $4,000 in cash, and Raiton gave the keys to the van and the padlock to Martorano. Martorano later gave these keys to DeTullio who returned to the van.

DeTullio unlocked and entered the van. He sat in the van for 1 to 1½ minutes before he was apprehended by F.B.I. agents and Philadelphia police who were in the area of the van to maintain surveillance of it and to prevent its removal. They removed DeTullio from the van and placed him under arrest, and they seized the van and the P–2–P. Martorano and Vadino sped away from the scene, but they were later apprehended.

### III.

It is well settled that when a defendant is charged with possession of a controlled substance with intent to distribute it in violation of 21 U.S.C. § 841(a)(1), possession can be either actual or constructive. *United States v. Raper,* 676 F.2d 841, 847 (D.C.Cir.1982); *United States v. Grayson,* 597 F.2d 1225, 1229 (9th Cir.), *cert. denied,* 444 U.S. 873, 875, 100 S.Ct. 153, 157, 62 L.Ed.2d 99, 102 (1979); *United States v. Crippen,* 459 F.2d 1387, 1388 (3d Cir.1972). Constructive possession may be shown through either direct or circumstantial evidence. *United States v. Raper,* 676 F.2d at 847; *United States v. Grayson,* 597 F.2d at 1229; *United States v. Davis,* 461 F.2d 1026, 1035 (3d Cir.1972). Constructive possession may be found if the evidence shows that the defendant "was knowingly in a position, or had the right to exercise 'dominion and control' of the drug either personally or through others." *United States v. Raper,* 676 F.2d at 847.

Martorano challenges his conviction on the grounds that these facts are insufficient to prove that he had possession of the P–2–P. When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether a jury could reasonably infer from the evidence that the defendant is guilty of the offense with which he is charged. *United States v. Davis,* 461 F.2d at 1035. The evidence must be construed in the light most favorable to the government. *Id.* at 1036.

The government concedes that Martorano did not have actual possession of the P–2–P. Thus, the crucial issue before us is whether

the evidence was sufficient for the jury to find that Martorano had constructive possession of the P–2–P. Martorano insists that he did not have constructive possession because the P–2–P remained at all times within the dominion and control of the F.B.I. Martorano's claim is predicated on the theory that constructive possession entails dominion and control giving the alleged constructive possessor the power to dispose of the drug. *United States v. Batimana,* 623 F.2d 1366, 1369 (9th Cir.), *cert. denied,* 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980); *United States v. Barnett,* 468 F.2d 1153, 1155 (9th Cir.1972); *Arellanes v. United States,* 302 F.2d 603, 606 (9th Cir.1962). Although Martorano and his co-conspirators expected DeTullio to drive away in the van that contained the P–2–P, Martorano claims that at no time did DeTullio possess the power to do so because of the presence of the law enforcement officers who were determined not to allow the van to be driven away. Thus, the basis of Martorano's claim is that the conspirators did not exercise actual dominion and control over the P–2–P because they did not acquire the power to dispose of it. Therefore, Martorano contends that he did not have constructive possession of the P–2–P.

The government, on the other hand, argues the theory of constructive possession adopted by the court below. Relying on *United States v. Moreno,* 649 F.2d 309, 312 (5th Cir.1981) and *United States v. Crippen,* 459 F.2d at 1388, the district court held that "[c]onstructive possession may be established by a showing of ownership, dominion, or control over the contraband ... or over the vehicle in which the contraband was concealed." *United States v. Martorano,* 541 F.Supp. at 1228. The court interpreted "dominion, or control" to mean "the ability to reduce [a controlled] substance to actual possession ...." Appendix at 146a.

The government insists that the ability to distribute or dispose of the P–2–P free of police interference is not necessary to show constructive possession because constructive possession of the P–2–P occurred at the moment that Martorano had the ability to

reduce it to actual possession. It argues that Martorano's ability to reduce the P–2–P to actual possession can be shown in two ways. It therefore offers two theories on which Martorano's constructive possession can be based. First, the government contends that Martorano acquired constructive possession when Raiton gave him the keys to the van and the padlock. Second, it contends that Martorano had constructive possession of the P–2–P by virtue of DeTullio's actual possession of the van and the P–2–P that it contained. The government notes that Martorano gave the keys to his agent, DeTullio; that DeTullio actually entered the van in possession of these keys; that DeTullio inserted the key in the ignition. DeTullio need only have started the engine and driven away to remove the van and the P–2–P from the place where the van was parked. The ultimate legal issue thus becomes whether the evidence was sufficient for the jury to find that Martorano had dominion and control of the P–2–P even though DeTullio did not start the van and drive it out of its parking spot.

## IV.

Judicial interpretations of the nature of "dominion and control" which constitutes constructive possession are conflicting. Martorano relies on the Ninth Circuit's definition of constructive possession as "dominion and control ... so as to give power of disposal of the drug." *Arellanes v. United States,* 302 F.2d at 606; *see also United States v. Batimana,* 623 F.2d at 1369; *United States v. Barnett,* 468 F.2d at 1155. He believes that, under this theory, the evidence in this case fails to establish constructive possession.

The Ninth Circuit's theory of constructive possession on which Martorano relies is not necessarily applicable to this case because its theory was developed and applied to determine the degree of appellant's participation in crimes committed by others. In *Arellanes v. United States, supra,* for example, defendant was the wife of a man convicted of importing and possessing heroin

and marijuana in violation of the Narcotic Drugs Import and Export Act. She was convicted, *inter alia,* on evidence that she occupied an apartment with her husband in which drugs were found and had accompanied her husband on a trip in a car in which other drugs were discovered. The issue in *Arellanes* was whether defendant's presence with her husband and the drugs was "a conclusively incriminating circumstance," 302 F.2d at 606, sufficient to "show the *possession* or *control* which the government must establish to raise the presumption of guilty knowledge." *Id.* at 606–07. (Emphasis in original.) The court held that it was not because "Mrs Arellanes' presence with both [her husband and the narcotics] is as fully explained by her attachment to her husband as it might be by a control over the drugs." *Id.* at 606. The court defined dominion and control as the ability to produce the drug for sale as a means of determining whether the defendant had guilty knowledge of the drugs and participated in the crime.

Thus, even if we were to apply the theory in *Arellanes* to this case, a jury still could have found that Martorano had constructive possession of the P–2–P. Martorano admits that the "evidence [was] sufficient to show an attempt by Martorano through DeTullio to possess the P2P," Brief on behalf of Appellants at 13, and that he participated in the sale of the P–2–P. Martorano was not acting as a philanthropist to benefit the people in Rittenhouse Square. The record establishes that Martorano handed over $104,000 to Raiton with the intent to possess the P–2–P for the purpose of distributing it. Therefore, on these facts, Martorano's presence at the scene of the transaction is "a conclusively incriminating circumstance," *Arellanes v. United States,* 302 F.2d at 606, to satisfy the test of *"dominion or control"* required by the court in *Arellanes.*

However, *Arellanes* is clearly distinguishable from the instant case. In *Arellanes,* the court was "pass[ing] upon the meaning of the word 'possession' as used in 21 U.S.C. §§ 174 and 176a." *Id.* at 606. This statute has since been repealed and is not relevant to the instant case. Moreover, the issue before us is the proper definition of "constructive possession," not "actual possession." Finally, the question in this case is not whether Martorano had guilty knowledge of and participated in a crime.

*United States v. Barnett, supra,* can be distinguished on similar grounds. The question in *Barnett* was whether appellant's participation in a drug sale was sufficient to constitute a violation of the now repealed 21 U.S.C. § 174. The court asserted

that a finding of possession turns upon whether

'One [has] a working relationship or a sufficient association with those having physical custody of the drugs so as to enable him to assure their production, without difficulty, to a customer .... But a casual facilitator of a sale, who knows a given principal possesses and trades in narcotics but who lacks the working relationship with that principal that enables an assurance of delivery, may not be held to have dominion and control over the drug and cannot be said to have possession of it.'

*United States v. Barnett,* 468 F.2d at 1155, quoting *Hill v. United States,* 379 F.2d 811, 814 (9th Cir.1967). The court found that Barnett's association with his co-defendants was insufficient to give him dominion and control over, and therefore, possession of the drug. However, in the instant case, Martorano does not challenge the sufficiency of his association with DeTullio. Indeed, he could not successfully raise such a challenge because the record demonstrates that DeTullio was Martorano's agent and that he was under Martorano's control. Therefore, Martorano could have been found guilty under the theory applied in *Barnett* because he was able to assure customers that he could produce the P–2–P barring unforeseen police interference.

In *United States v. Batimana, supra,* the third case on which Martorano relies, appellants acted as lookouts for their co-conspirator who purchased heroin from a police informant for the purpose of distributing it

in violation of 21 U.S.C. § 841(a)(1). Although appellants were present at the sale and the principal stated that appellants were to sell the heroin the next day, the court concluded that the appellants did not assert dominion and control over the heroin.

The facts of *Batimana* are not inconsistent with a finding of constructive possession in this case. In *Batimana,* the conspirators were in a hotel room with the informant/seller; the heroin was delivered; the informant/seller took possession of the heroin, but he never relinquished control; DEA agents entered the hotel room and arrested the conspirators within minutes of their delivering the heroin. The evidence shows that none of the conspirators took actual possession of the heroin. The record is also devoid of evidence showing that a purchase and sale of the heroin was effected before the arrests. Moreover, appellants did not participate in a conversation between the principal and the informant that might have resulted in the purchase and sale. Therefore, the appellants, and possibly even the principal, did not have dominion and control that might have enabled them to take active possession let alone to dispose of the drug.

*Batimana,* therefore, is distinguishable from the instant case. Here, the purchase and sale were completed; Martorano's agent was in sole possession of the van and of the keys to the van in which the P–2–P was contained; he was in sole possession of the key to the lock that secured the P–2–P. In short, the government agents here had relinquished actual possession of the P–2–P to Martorano and his co-conspirators.

■ The interpretation of dominion and control as the ability to reduce an object to actual possession relied upon by the district court was affirmed in cases that were based on the same statute and that are factually more similar to the instant case than those relied upon by appellant. This theory was used in those cases to decide the same issue that is before us: whether the appellants had dominion and control sufficient to attribute to them constructive possession of a controlled substance with the intent to distribute it. It is this theory which we adopt

today in interpreting constructive possession. Applying this theory to the facts of this case, we conclude that Martorano acquired constructive possession of the P–2–P when he acquired actual possession of the keys to the van and to the padlock. He remained in constructive possession after he gave the keys to his agents who subsequently took actual possession of the van. Our conclusion finds support in the following cases.

For example, in *United States v. Moreno, supra,* appellant directed co-conspirators in a plan to load and transport 1936 pounds of marijuana that was owned by appellant's brother. Before the co-conspirators reached their destination, they were stopped by border patrol agents who discovered the marijuana. Appellant and the other co-conspirators were indicted for conspiracy to possess marijuana with intent to distribute it, and for possession of marijuana with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1).

They were convicted, and appellant challenged his conviction for possession of marijuana with intent to distribute it on the ground that the evidence failed to prove that he had actual or constructive possession of the marijuana. The court upheld Moreno's conviction after finding that he played an "integral part of the narcotics distribution operation and ... enjoyed a close and continuous working relationship with those ... who may have had actual physical possession of the marijuana." *United States v. Moreno,* 649 F.2d at 313. The court noted that Moreno, as did Martorano in the instant case, "instruct[ed] and monitor[ed] the progress of the men who had actual possession of the marijuana ...." He also had the responsibility to pay them for their services. The court held that

> [p]hysical custody of narcotics by an employee or agent whom one dominates, or whose actions one can control, is sufficient to constitute constructive possession by the principal.

*Id.*

The theory of *Moreno, supra,* is applicable to the instant case in which DeTullio was

Martorano's agent and was subject to Martorano's control. Martorano monitored DeTullio's actions. DeTullio exercised dominion and control over the P–2–P by virtue of his actual possession of the van in which it was contained. Therefore, under the theory of *Moreno,* a jury could find that Martorano had constructive possession of the P–2–P.

Our conclusion finds additional support in *United States v. Martinez,* 588 F.2d 495 (5th Cir.1979). In *Martinez* one Harmon was stopped at a Texas border patrol checkpoint and detained for questioning after the agent detected the odor of marijuana emanating from the trunk of the car Harmon was driving. However, Harmon did not have the trunk key. Appellant was driving another car through the same checkpoint at approximately the same time. He was stopped also. The agent learned that appellant possessed the key to the trunk of Harmon's car as well as the keys to two suitcases and two chests that were found in the trunk, all of which contained marijuana. Appellant was indicted, tried and convicted of knowingly or intentionally possessing a controlled substance with intent to distribute it in violation of 21 U.S.C. § 841(a)(1).

The court rejected appellant's challenge to his conviction on the grounds that the evidence failed to prove that he had possession of the marijuana. It concluded that "constructive possession is the ability to reduce an object to actual possession." *Id.* at 498. The court reasoned that

> [a]lthough appellant neither owned nor drove the car in which the contraband was found, he possessed the trunk key to such car. He also possessed keys which unlocked two chests containing contraband found in the trunk of the car.

*Id.* at 498–99. The court concluded that "[a]ppellant thus shared dominion and control over the vehicle and the marijuana." *Id.* at 499.

In the instant case, Raiton gave the keys to the van and the lock to Martorano. At that point Martorano had the ability to reduce the van and the P–2–P to actual possession. While the mere possession of

the keys by Martorano was arguably enough to attribute to him constructive possession under *Martinez,* Martorano's subsequent giving of the keys to DeTullio and the latter's taking actual possession of the van containing the P–2–P make such a conclusion more compelling.

*Moreno* and *Martinez* are arguably distinguishable from the instant case because the appellants' agents in those cases had the kind of dominion and control that Martorano claims he did not have on the facts of the instant case. However, a case recently decided in the Eighth Circuit raised the exact same issue as does Martorano, and involved strikingly similar facts. The court there upheld the appellant's conviction using the same theory as we do today.

Appellant in *United States v. Jones,* 676 F.2d 327 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 71, 74 L.Ed.2d 71 (1982), purchased 200 pounds of marijuana from DEA agents. The agents delivered the marijuana in two unmarked cars. Appellant parked his van alongside of the agents' cars. The agents gave the trunk keys to appellant when he paid them for the marijuana. Appellant transferred the marijuana from the undercover cars to his van, and the agents then arrested appellant and two accomplices.

Appellant challenged his conviction for possession of a controlled substance with the intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and 846. He contended, as Martorano argues in the instant case, "that the evidence was insufficient as a matter of law, to establish 'possession' because the government agent at all times had control of the bales of marijuana." *United States v. Jones,* 676 F.2d at 332.

The court denied appellant's appeal and held:

> The evidence was sufficient to show that Jones *obtained constructive possession when he was given the key to the agent's car trunk* and obtained actual possession when he loaded the bales of marijuana into the van.

*Id.* (emphasis added). Appellants' claims in both cases are identical: Because of the alleged impossibility of their escaping with the controlled substance they did not have dominion and control over it. Of particular importance to the instant case, therefore, is the court's conclusion in *Jones* that "[t]he fact that the agents intended to arrest Jones and recover control of the marijuana does not negate the fact, that for however short a period of time, Jones was in actual control of the marijuana." *Id.*

This finding was made under circumstances similar to those before us. While *Jones* is not binding authority, it does support the district court's holding in this case that

> [r]eceiving a key to the van in exchange for $104,000, having that key in one's possession, and then giving that key to an associate, or agent, who enters and inspects the van with the present ability to drive it away constitutes constructive possession . . . . He was prevented from doing so only because government agents seized the van as his agent took actual possession. This seizure terminated Martorano's brief dominion over the contraband but that does not mean such dominion never existed.

*United States v. Martorano,* 541 F.Supp. at 1229–30. The district court noted that "it was possession with intent to distribute, and not the separate offense of distribution, of which Martorano was found guilty." *Id.* at 1230. The court correctly found that the conspirators were arrested after they had completed all of the acts they were required to perform to commit this crime. That they were arrested before they had the opportunity to dispose of the P–2–P does not negate their possession of it with the intent to distribute it.

Martorano's petition thus reduces to his insistence that the agents afford him and his co-conspirators an opportunity to dispose of the controlled substance before Martorano can be convicted of possession with the intent to distribute it. This contention defies common sense. It is particularly unmeritorious on the facts before us.

This is not a case of police entrapment. Martorano initiated the transaction; he devised the plan by which the transaction was executed; every act that had to be performed to complete the transaction and the crime was accomplished. To require also that the police allow the criminals to escape with the drugs would place an impossible burden on the police and on the courts seeking to enforce criminal statutes as well as contribute to the very evil that the statute is intended to eliminate.

For the foregoing reasons, the decision of the district court will be affirmed.

GIBBONS, Circuit Judge, dissenting.

The central issue presented by this appeal is the extent to which the federal courts will read into federal criminal statutes legal fictions thrice compounded for the purpose of facilitating the government's practice of overcharging with respect to cases in which it has provided the wherewithal of crime through its stables of criminal informants. In this instance the government's chosen instrument was Ronald Raiton, a notorious long-term professional criminal, who, when caught, signed on to bait the trap for others. He successfully baited a trap for the conspirators, Raymond Martorano, John Berkery and Frank Vadino, by informing them that he could deliver a van containing 50 gallons of P2P for $100,000.

A taped conversation establishes that Martorano, Berkery and Vadino, as early as June 10, 1981, conspired, in violation of 21 U.S.C. § 846 (1976), to possess the 52 gallons found in the van. There is no question that the conspiracy continued through July 28, 1981, when arrests were made. The jury found Martorano guilty of conspiracy. He was sentenced to a five year term on the conspiracy count to be followed by three years of special parole. Martorano does not appeal the judgment of sentence on the conspiracy count. He does appeal a consecutive five year sentence imposed for possession of the 52 gallons of P2P with intent to distribute, contending that while from the evidence the jury could find that he conspired to possess with intent to distribute,

no reasonable person could conclude that the conspiracy succeeded, even momentarily.

The reason for the government's zeal in charging both conspiracy and possession with intent to distribute is quite evident. Section 846 provides that a person who attempts or conspires shall be punished by imprisonment not to exceed the maximum for the offense the commission of which was the object of the attempt or conspiracy. P2P is a Schedule II controlled substance, and the maximum sentence for possession of it with intent to distribute is five years. 21 U.S.C. § 841(b)(1)(B) (Supp. IV 1980). Thus Martorano has received the maximum jail sentence permitted for the aborted conspiracy. But by resorting to the patent fiction that the conspiracy actually succeeded, for some metaphysical moment at least, the government has succeeded in doubling the maximum sentence for the section 846 offense. I can understand the overzealousness of the Drug Enforcement Administration in attempting to maximize incarcerations resulting from its use of the notorious Mr. Raiton. Why my colleagues in the majority should so share that overzealousness as to rewrite section 841, turning it into a conspiracy or attempt statute, is a question beyond my comprehension.

The P2P in question originated in a federal storage facility for controlled substances in Florida. There was never a moment—not the smallest fraction of the earth's rotation—during which the P2P was not completely and effectively subject to the physical domination and control of agents of the federal government. The conspiracy offense was well advanced before Raiton, on July 28, 1981, rented a van in which delivery was to be made. In renting the van Raiton acted, not on behalf of the conspirators, but on behalf of his principal, the United States government. Raiton turned the van over to the F.B.I., which placed the federal government's property in its rear compartment, the doors of which were padlocked and which was inaccessible from the cab. The van was parked in Philadelphia on the south side of Pine Street between 19th and 20th Streets. Raiton was not given possession of the van. Instead he was given the ignition key and a padlock key and instructed to meet Martorano at a prearranged rendezvous in Rittenhouse Square.

While Raiton was completing the rendezvous with Martorano, eleven law enforcement officers had the locked van under close and constant surveillance. These included agents of the Drug Enforcement Administration, F.B.I. agents, and Philadelphia police officers. F.B.I. Agent Widman was assigned the task of watching to see if anyone approached the van, and to signal the other ten officers in that event.

At the rendezvous spot in Rittenhouse Square Martorano asked Raiton to write down the description of the van and its location so it could be checked out. Raiton did so, and Martorano gave this information to Vadino. Martorano then gave Raiton a shoebox containing $100,000, and Raiton placed the ignition key and the padlock key on the park bench. Vadino, meanwhile, went to inspect the van. He and another conspirator, DeTullio, returned to Rittenhouse Square, where Martorano gave DeTullio the key. DeTullio returned to the van. He did not attempt to open the padlock, because Raiton's suggested method of transfer was that the van would be driven to another location. Obviously the government agents were perfectly confident that no attempt would be made to unload 52 gallons of P2P on Pine Street in center city. DeTullio approached the driver's compartment, opened the door, sat in the seat, and put the ignition key in the ignition. There is no evidence that he even started the engine. He was arrested immediately. The van never moved an inch prior to the arrest. The P2P never moved an inch. DeTullio never even saw it.

The government concedes that Martorano never had actual possession of the P2P. It urges, and the majority agrees, that he had constructive possession. The majority's discussion of constructive possession starts with the observation that "judicial interpretation of the nature of 'dominion and con-

trol' which constitutes constructive possession are conflicting." Typescript p. 8. What is noticeably missing in the opinion, however, is any disclosure of which of the conflicting interpretations it purports to adopt as the test for this circuit. Instead there is a seriatim description of the holdings in a series of cases which are said to be either distinguishable or satisfied. But unless interpretation of criminal statutes is to degenerate into an exercise in fantasy, a definition of the term "possession," even if dressed up with adjectives like constructive, must have some relationship with physical reality.

The extent to which the majority has journeyed into fantasy land is perhaps best illustrated by its reliance, typescript 9, 10, on the fact that Martorano was attempting to possess the P2P. "Martorano was not acting as a philanthropist to benefit the people of Rittenhouse Square." *Id.* Of course he wasn't and he has been found guilty of a violation of section 841. But his "attempt" was no more successful than if Raiton had handed him a key for a different vehicle or a different padlock, or for a vehicle from which the distributor rotor had been removed. That Martorano thought he was obtaining constructive possession is simply irrelevant. When he gained possession of the key the government still maintained effective and total dominion and control over its 52 gallons of P2P. Martorano had simply been defrauded by the ingenious Mr. Raiton. He no more gained any actual control over the P2P than did any other passerby in Rittenhouse Square.

When Martorano gave the keys to DeTullio, his actual control over the P2P increased not an iota. The van was still under surveillance by eleven government agents. All the participants understood that the P2P was not to be unloaded on Pine Street. There is no evidence from which a jury could find that the government had any intention of permitting the van to be moved. The arrest was almost instantaneous; so much so that there is no

evidence that the ignition key was turned.[1] Yet the majority fantasizes that "DeTullio exercised dominion and control over the P2P by virtue of his actual possession of the van in which it was contained." DeTullio had no more actual possession of the van, in the sense that he had any realistic chance of moving it, than had it been locked in the basement of the Federal Building. The surveilling agents never intended to relinquish and never relinquished effective total control over the large quantity of government property contained in it.

The ultimate cynicism of the majority position is disclosed in the last full paragraph of its opinion, which reasons:

> Martorano's petition thus reduces itself to his insistence that the agents afford him and his co-conspirators an opportunity to dispose of the controlled substance before Martorano can be convicted of possession with intent to distribute it. . . . To require also that the police allow the criminals to escape with the drugs would place an impossible burden on the police and on the courts seeking to enforce criminal statutes as well as to contribute to the very evil that the statute is intended to eliminate.

Typescript, 17–18. One can accept this tortured reasoning only if one accepts that the *prevention* of crime is not in itself a worthy object of law enforcement. Thwarting a threatened homicide, rape or robbery while it is still in the attempt or conspiracy stage seems, to me at least, a perfectly worthy object of law enforcement. It would be weird, to say the least, to accept the premise that the unsuccessful killer, rapist or robber could nevertheless be convicted, substantively, of constructive murder, rape or robbery. In this instance the government took perfectly appropriate steps to prevent Martorano and his fellow conspirators from gaining possession of the P2P with intent to distribute it, by maintaining governmental possession and control throughout the entire transaction. The suggestion of the majority that if we refuse

1. That the engine was not started suggests the possibility that the distributor rotor had been removed. Indeed it is hard to believe that the surveilling agents would be so reckless of their own safety and that of the standersby as to neglect that elementary precaution in the circumstances described.

to recognize the plain fact that the violation of section 841 was successfully prevented we will "require ... that the police allow the criminals to escape with the drugs," *id.* 17, is completely illogical. It is also insulting to those dedicated agents of the federal government whose primary responsibility is crime prevention.

The issue in this case is not the phony one constructed by the majority of how far the government's agents must go in allowing crime to occur. It is rather how far the United States Attorney can go in relying on potential offenses which have been successfully prevented in order to pyramid sentences for conspiracy or attempt beyond the sentences which Congress has authorized. The majority's labored effort to read into section 841 a doctrine of constructive criminality so as to justify sentence pyramiding is logically indefensible, morally reprehensible, and a potentially dangerous precedent. Doctrines of constructive criminality should find no place in the jurisprudence of a free society.

Since the section 841 offense was effectively prevented by the government's maintenance of complete dominion and control of the controlled substance, I would reverse the conviction on that offense.