UNITED STATES of America, Appellee,

v.

Hadi ZANDI, Appellant.

UNITED STATES of America, Appellee,

v.

Mehdi ZANDI, Appellant.

Nos. 84–5320, 84–5321.

United States Court of Appeals, Fourth Circuit.

Argued June 7, 1985.

Decided Aug. 8, 1985.

David B. Adler, Washington, D.C., Garth M. Wainman, Fairfax, Va. (Hazel, Beckhorn & Hanes, Fairfax, Va., on brief), for appellants.

Dale A. Zusi, Sp. Asst. U.S. Atty. (Elsie L. Munsell, U.S. Atty., Alexandria, Va., Kenneth E. Melson, Asst. U.S. Atty., Arlington, Va., Daniel W. Cotter, Third Year Law Student on brief), for appellee.

Before MURNAGHAN and SNEEDEN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

MURNAGHAN, Circuit Judge:

I.

Hadi and Mehdi Zandi seek reversals of their convictions for possession of opium with intent to distribute on the following grounds: 1) the delay between their indictment and trial violated the Speedy Trial Act, 18 U.S.C. § 3161 (Supp. IV 1980); 2) the government failed to prove that the Zandis *possessed* the opium within the meaning of 21 U.S.C. § 841(a)(1); 3) the government failed to prove that the Zandis had *knowledge* that opium was concealed within a package labelled "gift cloth"; 4) the Zandis were not given any notice by the government that it would attempt to prove a conspiracy at trial; and 5) certain prejudicial evidence was wrongfully admitted.

On October 26, 1983, Hadi and Mehdi were arrested at Dulles International Airport as they attempted to claim a package, which, on arrival from Pakistan, had been stored in a bonded customs warehouse. On the basis of the contents of the package, both appellants were charged by the Government with importation of opium, 21 U.S.C. § 952(a), and possession of opium with intent to distribute, 21 U.S.C. § 841(a)(1).

A preliminary hearing was held on November 3, 1983 before a Magistrate. Probable cause was found on the charges brought against Hadi, however, the charges against Mehdi were dismissed for lack of probable cause. On November 28, 1983, the charges against Hadi, pursuant to the Government's request, were dismissed without prejudice.

On April 2, 1984, a grand jury for the Eastern District of Virginia returned a two count indictment against Hadi and Mehdi. Count I charged a violation of 21 U.S.C. § 952(a) (importation) and Count II charged a violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute) and 18 U.S.C. § 2 (aiding and abetting).

Mehdi was notified of the pending indictment on June 29, 1984 when he was arrested at his home. Mehdi pled not guilty to both counts. Hadi returned from California, where he was living, and turned himself in on July 10, 1984. Hadi also pled not guilty to both counts. Trial was scheduled for August 29, 1984.

Prior to trial, the Zandis filed motions, *inter alia*, seeking dismissal of the indictment on speedy trial grounds. After pretrial hearings were held, the motions were denied. The district court, however, granted the government's motion for a continuance and rescheduled the trial for September 18, 1984. The jury returned verdicts of not guilty on Count I (importation) and guilty on Count II (possession with intent to distribute) as to both defendants.[1]

The appellants were each sentenced to one year imprisonment and a three year special parole term.

1. The appellants' post trial motions for judgment of acquittal or alternatively for a new trial, raising issues similar to those on appeal, were denied by the district court.

## II.

Mehdi and Hadi are brothers who were living with their Uncle Noormohammedi ("Uncle Noory") in the United States. Appellants are Iranian citizens. Morteza Zandi is a brother of the appellants who, in 1982, fled Iran and went to Pakistan. While in Pakistan, Morteza received financial support from the appellants amounting to $10,000 by August 3, 1983.

On August 3, 1983, Mehdi called Morteza in Pakistan. Mehdi recorded the conversation. The brothers engaged in a rather cryptic discussion about a "box of presents" which was to be sent to the United States from Pakistan. The box was to be sent to a post office box number provided by Mehdi. Morteza requested that $3,000 be sent to him. On August 22, 1983, Hadi sent Morteza the requested sum.

On September 22, 1983, the manifest to the box referred to in the recorded conversation of August 3, 1983, was sent to a post office box of Uncle Noory's friend, Mohammed Ayat. The return address was a hotel in Pakistan at which Morteza had previously been a guest. The manifest indicated that the package contained "gift cloth." The package was addressed to "Kamran Divani KISA." [2] The name of the shipper was false.

On October 24, 1983, after learning that the package had arrived at Dulles airport, the appellants went to pick it up. They paid $5.00 to obtain an airway bill receipt and a carrier's certificate. That same day, the appellants took the documents to Cosimano, Inc., in whose bonded warehouse at Dulles the package was being stored. Cosimano told them that they had to pay a $50.00 storage fee and a $20.00 after hours surcharge before receiving the package. Mehdi allegedly told Cosimano that he would come back the next day during normal hours in order to avoid the surcharge.

On October 25, 1983, Mehdi returned to the warehouse, paid the $50.00 storage fee, obtained the receipt for it and produced the airway bill and carrier's certificate. Mehdi then asked a warehouse employee to bring the package to the front office. She did so and informed Mehdi that a Customs inspector was in the office ready to clear the package. Mehdi, however, left abruptly without obtaining possession of the package.[3]

Mehdi's abrupt departure raised the suspicions of the warehouse staff. A customs inspector was promptly called. The inspector opened the package and discovered packets of opium. Some of the opium was removed and the box was resealed.

On October 26, 1983, Hadi and Mehdi drove to the warehouse to pick up the box. Mehdi stayed in the car while Hadi went inside to claim the package. Hadi presented the necessary documents to Cosimano. Cosimano had the box brought up to the front office. Hadi stated that he was picking up the package for his Uncle Noory. After Hadi was handed the package, he was asked by a custom's officer to open it for inspection. Hadi complied and assisted in the removal of articles from the box. During the inspection, the opium was discovered. Hadi was immediately arrested. Mehdi was then arrested in his car.

## III.

The appellants contend that their indictments should have been dismissed because they were not brought to trial within 70

---

**2.** When Ayat's wife received the manifest in her husband's post office box, she showed it to her husband. Ayat testified that he had stopped participating in the KISA business three years earlier and thus returned the shipping notice to Air Cargo with the notation "no such person, return to sender." Since the package was not claimed within 5 days, Air Cargo transferred the package from its warehouse to the Cosimano warehouse where it remained unclaimed until October 24, 1983.

**3.** Mehdi testified at trial that he paid the $50.00 fee and then rushed to pre-register for a class at the University of Maryland. He also testified that he attended the class on that date from 12:30 to 5:30. A tape transcript of a call between Mehdi and his Uncle Noory on October 26, 1983 has Mehdi stating that he attended class from 9–5:30 and that he had no idea who paid the $50.00 storage fee.

days of their indictment on April 2, 1984; the four day trial began on September 18, 1984. While the appellants did not explicitly state which provision of the Speedy Trial Act was implicated in the instant action, they presumably rely upon § 3161(c)(1) of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.:*

> (c)(1) In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs. If a defendant consents in writing to be tried before a magistrate on a complaint, the trial shall commence within seventy days from the date of such consent.

They further claim that the government did not use "due diligence" to find Hadi and Mehdi after they were indicted [4] and thus it cannot avail itself of the pertinent excludable delay provision in the Act. *See* 18 U.S.C. § 3161(h)(3)(B).[5]

The language in § 3161(c)(1) indicates that the seventy day statutory period for the commencement of a trial runs from the "filing date ... of the ... indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, *whichever date last occurs.*" Since the appellants, in the instant case, appeared before a judicial officer *after* the date of the indictment, the dates of arraignment, *and not the date of indictment,* are relevant to our Speedy Trial inquiry.[6] Accordingly, we must determine whether the Zandis were tried within 70 days of their arraignment.

■ Mehdi was arraigned on July 9. Hadi appeared before a judicial officer even later than Mehdi since he first turned himself in on July 10, 1984. The period from July 9 (or July 10) to August 29 was far less than 70 days, thus, the August 29 trial

---

**4.** In trying to locate the appellants, the FBI agent working on the case, Mr. Rivera, went to the brothers' residence in Falls Church, Virginia. He learned that they had moved and had disconnected the phone. He did not check the post office to see if a forwarding address had been left but he subpoenaed C & P records regarding the brothers' phone service. Mehdi had, in fact, left a forwarding address card at the post office. Rivera learned in mid April that the brothers requested that their last phone bill be forwarded to an address in Arlington. Rivera never checked that address to see if the brothers lived there. He claimed that since the name on the last phone bill was not "Zandi" he presumed the brothers were not there. The defense attorneys for the brothers were contacted but they did not disclose the whereabouts of their clients. Since Rivera could not find them, he designated them administrative "fugitives" and placed their names in the National Crime Information Computer. Rivera went away during the month of May to Costa Rica and little was done to find the brothers during his absence. When he returned in June, he placed the Arlington, Virginia residence under surveillance (the address given to him by C & P in April) and soon located and arrested Mehdi. Mehdi had been living there since the spring and had taken out a lease on the apartment. Hadi thereafter returned from California and turned himself in. The authorities knew in April, through various sources, that Hadi was in California but they did not know how to find his exact whereabouts.

**5.** 18 U.S.C. § 3161(h)(3)(B):

> (h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:
>
> ....
>
> (3)(A) Any period of delay resulting from the absence or unavailability of the defendant or an essential witness.
>
> ....
>
> (B) For purposes of subparagraph (A) of this paragraph, a defendant or an essential witness shall be considered absent when his whereabouts are unknown and, in addition, he is attempting to avoid apprehension or prosecution or his whereabouts cannot be determined by due diligence. For purposes of such subparagraph, a defendant or an essential witness shall be considered unavailable whenever his whereabouts are known but his presence for trial cannot be obtained by due diligence or he resists appearing at or being returned for trial.

**6.** *United States v. Haiges,* 688 F.2d 1273, 1274 (9th Cir.1982) ("When a defendant is indicted prior to his arrest, the seventy-day pretrial period runs from the date of his arraignment.").

date clearly complied with the time prescriptions of the Speedy Trial Act. As to the continuance to September 18, it constituted excludable delay and therefore did not offend the 70 day trial requirement.[7]

Since there had been no violation of the Speedy Trial Act the issue of "due diligence" need not have been reached by the district court. *See United States v. Fielding*, 645 F.2d 719 (9th Cir.1981). In *Fielding*, the appellant had been indicted on July 15, 1975. He was arrested in April 1979, approximately four years later, in Peru. He was then returned to the United States and arraigned on May 30, 1979. The trial was scheduled for July 16, 1979, clearly within the 70 day period prescribed in 18 U.S.C. § 3161(c). The government thereafter sought a one month continuance. The appellant contended that the one month continuance was unjustified and, as a result, the granting of the continuance resulted in a violation of the Speedy Trial Act. The Ninth Circuit ruled that the continuance was proper and therefore rejected appellant's speedy trial claim. Significantly, whether the government exercised "due diligence" in locating the appellant during the four year period between indictment and arrest was not in issue since the relevant time period, for Speedy Trial Act purposes, began only after arraignment in May 1979 (i.e. after the appearance before a judicial officer).[8]

▮ We next turn to the issue of whether there was sufficient evidence for a jury to conclude that the brothers had possession of the opium. Possession of a controlled substance with intent to distribute, as prohibited by 21 U.S.C. § 841(a)(1), may be either actual or constructive. *United States v. Raper*, 676 F.2d 841, 847 (D.C.Cir.

1982). Constructive possession exists when the defendant exercises, or has the power to exercise, dominion and control over the item. *United States v. Laughman*, 618 F.2d 1067, 1077 (4th Cir.1980), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980). The appellants contend on appeal that they never had actual or constructive possession of the opium and that, therefore, their convictions must be reversed. According to the appellants, although they possessed the PIA Airway Bill, customs officials had complete control and dominion over the package and were directed by law not to release the package until it had been inspected. In rebuttal, the government argued 1) that the appellants had "constructive possession" of the drugs because they possessed the shipping documents which authorized the holders thereof to gain receipt of the goods and 2) that the mere fact government officials, pending customs clearance, had an inspection duty to perform before the Zandis could obtain full control of the drugs was not dispositive on the issue of constructive possession.

*United States v. Martorano*, 709 F.2d 863 (3d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983) amply supports the government's characterization of constructive possession. In *Martorano*, Martorano intended to distribute large quantities of a controlled substance, P–2–P. He devised a plan under which a DEA informant (unbeknownst to Martorano) would rent a van, place the drugs in the van and park the van in a local square. Martorano gave the DEA agent money for the drugs at a designated meeting place and the DEA agent, in turn, gave Martorano the key to the van and a padlock for the rear doors of the vehicle. FBI

---

7. The Zandis concede that the period August 29 to September 18 was properly excludable.

8. It should be noted that at oral argument, the appellants disavowed any reliance upon the *constitutional* right to a speedy trial and merely focused on their statutory right to a speedy trial as outlined in the Speedy Trial Act. Even if the appellants had asserted a sixth amendment violation of their right to a speedy trial, thereby invoking the four part test set out in *Barker v.*

*Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the emphasis of which was somewhat modified in *United States v. MacDonald*, 456 U.S. 1, 7–8, 102 S.Ct. 1497, 1501–02, 71 L.Ed.2d 696 (1982), we could not conclude, after considering all relevant factors, that the five month delay between indictment and trial constituted a denial of their constitutional right to a speedy trial.

agents seized the van before Martorano ever took actual possession of the drugs. The Third Circuit ruled that Martorano "acquired constructive possession of the P-2-P when he acquired actual possession of the key to the van and to the padlock." *Id.* at 869. The mere fact that government officials prevented him from taking absolute control over the drugs did not detract from his culpability under 21 U.S.C. § 841(a)(1).

■ Likewise, in the instant case, the appellants acquired constructive possession of the opium when they acquired actual possession of the shipping documents. That the customs officials inspected the package, discovered the opium and thereupon prevented the brothers from gaining actual possession of the opium, did not render their conviction under the statute legally flawed—i.e. lacking the essential element of "possession." [9]

■ The appellants contend that even if they had constructive possession of the opium, the government failed to prove beyond a reasonable doubt that the brothers had knowledge that the package contained opium. Therefore, they assert, their convictions cannot be upheld. Knowledge, it is true, is an essential element of an offense under 21 U.S.C. § 841(a)(1). In determining whether there was sufficient evidence regarding "knowledge" to sustain the guilty verdicts, the court must consider whether any rational trier of fact could have found the existence of knowledge beyond a reasonable doubt. *United States v. Steed,* 674 F.2d 284 (4th Cir.1982), *cert.*

*denied,* 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 68 (1982). The Court must uphold the guilty verdict if there is substantial evidence viewed in the light most favorable to the government. *United States v. Jones,* 735 F.2d 785 (4th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984).

■ The government tried to prove knowledge circumstantially. That is, the government attempted to show that Morteza had access to plentiful and inexpensive opium in Pakistan, that Hadi and Mehdi sent Morteza money to Pakistan to help finance the drug transactions, and that Morteza and Mehdi had a mysterious telephone conversation regarding "gifts" being sent to the United States for later sale. The government also impressed upon the jury that Mehdi's and Hadi's false exculpatory statements at the time of their arrest were consistent with a guilty conscience.[10] Although the jury was asked to proceed along a logical line involving several steps, a rational juror could certainly have found that the brothers had knowledge opium was in the package.

■ Next we consider the appellants' contention that the government's use of a conspiracy theory at trial unfairly prejudiced them at trial. It is well recognized that coconspirator's statements can be admitted even though conspiracy was not charged in the indictment. *See* 4 Weinstein Evidence ¶ 801(d)(2)(E)[01]. (There need not be a conspiracy count in the indictment to make co-conspirator's statements admissible pursuant to F.R.E. 801(d)(2)(E) ).[11]

---

9. While there undoubtedly exists a risk of overzealous and too broad use of the notion of "constructive possession," the possibility does not exist in the present case since the appellants' payment of the necessary shipping and storage fees, their possession of the legally recognized shipping documents, and their request to have the package brought forward at the warehouse afforded more than sufficient indicia of constructive possession.

10. When arrested at the airport, Hadi told the police that he had not seen his brother since the previous night even though Mehdi was waiting in a car outside of the customs warehouse.

Likewise, Mehdi falsely stated to the police that he did not know Hadi (when shown a picture of his brother). Mehdi made other false and inconsistent statements to the police regarding his attendance at a class at the University of Maryland.

11. **Rule 801. Definitions:**
   **(d) Statements which are not hearsay.** A statement is not hearsay if—
   **(2) Admission by party-opponent.** The statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

*See also United States v. Weiner,* 578 F.2d 757, 768 (9th Cir.1978), *cert. denied,* 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978) ("It is not necessary for a charge of conspiracy to have been brought in order for coconspirator hearsay to become admissible."). The admissibility of such statements, however, "turns on the existence of substantial evidence of the conspiracy other than the statement[s] [themselves]." *United States v. Hines,* 717 F.2d 1481, 1488 (4th Cir.1983) (citation omitted), *cert. denied, sub nom. Eleazar v. United States,* —— U.S. ——, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984).

The government tried to establish that there was a conspiracy between the three brothers and their Uncle Noory to import opium. The court ruled that the government did not prove Uncle Noory's participation in any conspiracy and therefore disallowed admission of any of Uncle Noory's statements under the co-conspirator hearsay rule. Nor did the government introduce any statements by Morteza which provoked an objection by defense counsel.[12]

■ The conspiracy relied on was one involving Mehdi and Hadi. The district court was very aware of the possibility of prejudice to the appellants as a result of admitting evidence regarding a conspiracy and therefore gave the jury cautionary instructions. The district court specifically instructed the jury that "the defendants are not on trial for any act, conduct not alleged in the indictment." Given the district judge's sensitivity to the prejudice issue from the outset, his discriminating rulings regarding the admission of co-conspirator's statements (i.e. disallowing Uncle Noory's statements), and his cautionary instruction to the jury, we are persuaded that the appellants were not unduly prejudiced by the government's trial strategy.

And, lastly, we address the evidentiary arguments raised by appellants. Mehdi took the stand in his own behalf. By taking the stand, his credibility became subject to attack on cross-examination. "Matters affecting the credibility of the witness are always open to cross-examination." *United States v. Raper,* 676 F.2d 841, 846–47 (D.C.Cir.1982). To impeach Mehdi, the government sought to prove that Mehdi gave false information on an employment application, visa card application (not yet mailed), lease, credit agency application, bank loan application form, and tax returns. The government thereafter introduced the documents themselves which were admitted by the district court. The appellants contend that such cross-examination was improper and irrelevant and that the introduction of the documents violated F.R.E. 608(b) which prohibits attacking credibility with extrinsic evidence.

■ The appellants' contention lacks merit. The cross-examination of Mehdi bore on a relevant matter, i.e. his credibility, and was entirely appropriate. The district court could perhaps have limited it in order to avoid cumulative testimony. However, its failure to do so was certainly not an abuse of discretion. As to the alleged 608(b) violation, courts generally hold that when a witness *admits* to having performed certain acts (in this case, Mehdi agreed to having filled out most of the documents in question) the prohibition against using extrinsic evidence is not applicable. *See Carter v. Hewitt,* 617 F.2d 961, 970 (3d Cir.1980). (The most "significant reason for finding no violation of the extrinsic evidence rule here [is that the Witness] *did not deny* having written the letter; rather, he conceded his authorship but claimed that the letter was not an effort to encourage the filing of false complaints.") (emphasis in original). Even if the admission of the documents ran afoul of 608(b), the district court's error in admit-

**12.** The only statements by Morteza that were admitted at trial were those made during the recorded conversation between Morteza and Mehdi, to which defense counsel did not object.

The government sought to admit such statements in order to prove that Morteza was the "source" of the opium.

ting them still did not constitute reversible error; the jury already heard, during cross-examination, testimony and questioning regarding the false statements on those documents. Thus, it was unlikely that the admission of such documents, itself, severely prejudiced the appellants.

 The appellants also claim that the district court erred by admitting Western Union receipts totalling approximately $10,000.00, representing the money sent to Morteza in Pakistan. They argue that the receipts were irrelevant and prejudicial and that it was especially improper to admit them because Morteza was not present to testify. The trial court has broad discretion in ruling on questions of relevancy and in balancing the probative value of relevant evidence against any undue prejudice. *See Hamling v. United States*, 418 U.S. 87, 124–125, 94 S.Ct. 2887, 2911–2912, 41 L.Ed.2d 590 (1974) ("Petitioners have very much of the laboring oar in showing that such rulings constitute reversible error, since 'in judicial trials, the whole tendency is to leave rulings as to the illuminating relevance of testimony largely to the discretion of the trial court that hears the evidence.'") (citation omitted). In the instant case, the district judge apparently deemed the receipts relevant to the question of both motive and reason; that is, money was allegedly sent to Morteza to help finance his drug transaction as well as to finance his trip to the West. Although Morteza was not present to testify regarding the receipts,[13] the district court admitted comments from the taped conversation between Morteza and Mehdi about Morteza's need for money which helped establish a foundation for the receipts. Hence, we conclude that the district judge's ruling with respect to the receipts was not an abuse of discretion.

AFFIRMED.

13. Morteza was in Canada when the trial was conducted. If he had come to the United States

he would not have been allowed to return to Canada.