**Kendrick H. GAINES, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 07–CF–1103.**

District of Columbia Court of Appeals.

Argued Nov. 18, 2009.
Decided May 6, 2010.

Donald L. Dworsky, appointed by the court, for appellant.

John V. Geise, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, Roy W. McLeese III and April E. Fearnley, Assistant United States Attorneys, and Florence Pan, Assistant United States Attorney at the time the brief was filed, were on the brief, for appellee.

Before GLICKMAN and FISHER, Associate Judges, and KRAVITZ, Associate Judge, Superior Court of the District of Columbia.*

KRAVITZ, Associate Judge:

A Superior Court jury found appellant Kendrick H. Gaines guilty of two counts of possession with intent to distribute a controlled substance. The verdict was based on evidence that appellant, a twenty-four-year-old black male, dropped a bag containing multiple packets of cocaine and marijuana as he fled on foot from police officers who had just stopped him in his car for driving while using a cellular telephone without a hands-free device in violation of District of Columbia law. On ap-

peal, appellant contends that the trial court impermissibly curtailed his Sixth Amendment right to expose the officers' biases and prejudices through cross-examination concerning their pretextual reliance on minor traffic violations as grounds to stop and search suspects for drugs and, in particular, their selective enforcement of the hands-free law against black males. Appellant also contends that the trial court gave an unbalanced jury instruction on flight and erroneously allowed the government to elicit an opinion from its drug expert on the ultimate issue of his intent to distribute. We find no reversible error and accordingly affirm appellant's convictions.

## I.

### A.

Four officers of the Metropolitan Police Department were working together in two marked scout cars on the night of February 18, 2007 "checking out drug activity" in an area of Northeast Washington. At approximately 11:45 p.m., the officers—Glenn and Jordan in one car, and Hairston and Heraud in the other—drove in tandem eastbound through the 1200 block of Raum Street, N.E. toward an apartment building on the corner known to the officers for drug use and other drug-related crime. The officers traveled eastbound on the one-way westbound street hoping to catch drug dealers out in front of the building by surprise.

As the officers proceeded slowly down the narrow street, appellant passed within a few feet of them driving a car heading westbound in the same block. Appellant, too, was driving slowly, and the officers were able to see him by looking directly into his car through its driver's-side front

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

window. Officer Heraud saw a portion of appellant's face, and Officers Heraud and Glenn both observed that appellant was using his left hand to hold a cellular telephone to his left ear in apparent violation of D.C.Code § 50–1731.04(a) (2004), which prohibits the use of a cellular telephone while driving except with a hands-free device. The officers discussed their observations over the police radio and decided to make a traffic stop. They turned their scout cars around, followed appellant through an alley, and tried to effect a stop in the 1200 block of Simms Place, N.E.

Appellant promptly pulled over to the curb in response to the scout cars' lights and sirens. Before any of the officers could approach to investigate, however, appellant jumped out of his car and took off running. Officer Heraud chased appellant on foot down Simms Place and into an alley on the north side of the block. It was a bitterly cold night, with recently fallen snow and ice covering the ground, and the footing was treacherous for both appellant and Officer Heraud.

Officer Heraud testified that as appellant led him around a turn in the alley he observed appellant reach into his left front pants pocket and pull out a black plastic bag rolled up in a ball. Officer Heraud testified further that without breaking stride appellant dropped the bag to the snow- and ice-covered ground and continued running, with Officer Heraud in pursuit approximately ten feet behind. Appellant and Officer Heraud soon emerged from the alley onto Mount Olivet Road, N.E., still separated by a few feet. Appellant, however, slipped and fell on some ice in front of a convenience store on Mount Olivet Road, and Officer Heraud apprehended him.

Officer Jordan joined Officer Heraud on Mount Olivet Road and maintained custody of appellant while Officer Heraud walked back into the alley to look for the black plastic bag. Officer Heraud testified that within a minute and a half he found the bag lying on top of the snow and ice in the same location in which he had seen appellant drop it during the chase. The officers recovered the bag and found inside of it seventeen zip-lock bags containing a white rock substance (later proven to be cocaine) and ten zip-lock bags containing a green weed substance (later proven to be marijuana). The officers arrested appellant for possession with intent to distribute, and in a search incident to the arrest they seized $307.62 in small bills from appellant's person. The officers subsequently issued appellant a traffic ticket for violating the hands-free law, although they did not recover a cellular telephone from appellant's person or seize or take photographs of a cellular telephone Officer Heraud testified he observed inside appellant's car following the arrest.

**B.**

Appellant sought through argument and cross-examination of the government's witnesses to present a defense that the officers were out late at night in a high crime area looking for pretextual reasons to stop and search people for drugs. Appellant argued that the officers' ulterior motives in stopping him for the hands-free violation showed their bias against him and cast doubt on Officer Heraud's testimony that he dropped the bag of cocaine and marijuana during the foot chase through the alley.

Appellant's counsel first articulated the defense theory in his opening statement. Counsel told the jury that this was "a case about police harassment, about police manufacturing an excuse ... to stop somebody and harass [him] and search [him] for drugs." Counsel continued, adding a suggestion that the officers focused their at-

tention on appellant because he is a black male: "And they manufacture this not because they're interested in issuing a ticket for using a cell phone without a hands-free device; they do it because they want to stop somebody, a black male driving a car, so that they can search for drugs." "[T]he evidence will show that ... the police are biased, they have a bias against [appellant], and they're biased against him because they're looking to just manufacture a drug case. And because the police are biased, because they are manufacturing this case, because [they are] harassing somebody, we expect that there will be questions as to the credibility of the police."

Officer Glenn was the government's first witness at trial. He told the jury on direct examination about his observations of appellant holding what appeared to be a cellular telephone to his ear while driving and about the officers' efforts to effect a traffic stop. In response to a question from the prosecutor, Officer Glenn explained that he and his partners "commonly initiate traffic stops over things like cell phones" because violations of traffic laws lead to accidents if the police do not intervene.

On cross-examination, appellant's counsel tried to establish an alternative motivation for the traffic stops effected by the officers. Specifically, appellant's counsel asked Officer Glenn whether the officers were trained "about ways that [they] can stop cars and commence searches of those cars." Officer Glenn answered "Yes." Yet when appellant's counsel then sought to pose a follow-up question ("And one of the things that you're taught about is how to make traffic stops so that you can go ahead and search cars and ask for—"), the government objected, and the trial court

sustained the objection. The court explained that in denying a pretrial motion to suppress, it had already determined that the officers observed appellant violating the hands-free law and that the stop of appellant therefore was lawful under the Fourth Amendment even if it was pretextual, *i.e.* even if it was motivated by investigative interests beyond the enforcement of the hands-free law. *See Whren v. United States*, 517 U.S. 806, 811–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).[1] The following discussion occurred at the bench:

THE COURT: You spent a lot of time in opening [statement,] and now you're going ... into basically challenging the legality of the stop, which I've already ruled is legal, so you can't be arguing to the jury through argument or cross-examination that the stop is pretextual because I've ruled the stop is legal. You can argue that the officers aren't telling the truth about what they saw, but you can't go into pretext stops because the jury's not going to be deciding the legality [of] the stop.

DEFENSE COUNSEL: We would submit that it's proper for the jury to assess the motives of the police and the bias of the police in terms of why they made the stop to begin with.

THE COURT: But the stop, the stop is not in question. And you can argue that he's not credible, the officers aren't credible that the defendant [had] drugs or [was] fleeing or anything else ... but I think basically what you're trying to say is, which you certainly implied in opening, was this is an improper stop and, therefore, [the jury] should find him not guilty, and you can't argue that.

---

1. Appellant does not challenge on appeal the trial court's pretrial ruling denying his motion to suppress.

Notwithstanding the trial court's ruling at the bench, however, the court then allowed appellant, over the government's objection, to ask Officer Glenn several additional questions relating to the officers' motives in stopping appellant for the hands-free violation:

DEFENSE COUNSEL: Now, officer, when you stop somebody for a traffic stop, is it—in this particular case was it your intention just to give a ticket for the traffic stop?

OFFICER GLENN: Yeah.

DEFENSE COUNSEL: You didn't have any other motives in stopping someone for a traffic stop at this time?

PROSECUTOR: Objection.

THE COURT: Overruled to some latitude.

OFFICER GLENN: Every traffic stop can lead somewhere else.

DEFENSE COUNSEL: And when you conduct a traffic stop at 11:45 in the evening, you're looking for it to lead to something else, aren't you?

OFFICER GLENN: Sometimes it does, sometimes it doesn't. We made multiple stops every night.

DEFENSE COUNSEL: But my question is what you're looking for.

OFFICER GLENN: We look for the violation that we stop them for, and if something else comes out of it then it does.

Appellant's counsel voluntarily moved on at this point to another subject of cross-examination. He never sought to ask Officer Glenn any further questions aimed at exposing the officers' pretextual motives in stopping appellant, and he never raised with Officer Glenn the issue of selective enforcement of the hands-free (or any other traffic) law on the basis of race.

Officer Heraud testified next for the government. On direct examination, he recounted his observations of appellant holding a cellular telephone while driving and told the jury about the officers' efforts to effect a traffic stop. He then described the chase and, in particular, the motion by which appellant dropped the black plastic bag of drugs to the snow- and ice-covered ground in the alley.

On cross-examination, Officer Heraud testified that he observes between one and fifteen drivers violating the hands-free law in the course of a typical eight-hour shift. He stated, however, that he does not conduct a traffic stop every time he witnesses a hands-free violation. Asked why not, Officer Heraud explained that he "may be responding to a radio assignment ... [or] have another purpose for [his destination], whether it be the Fifth District, whether it be a radio assignment." Appellant's counsel tried to probe further and to explore other possible motivations for Officer Heraud's decisions to stop some but not all of the drivers he observes violating the hands-free law. The government objected, however, and the trial court ruled once again that the defense could not cross-examine the government's witnesses (or argue to the jury) about the officers' reasons for stopping motorists for hands-free violations:

DEFENSE COUNSEL: But if—if you want to find a reason to pull that car over—

PROSECUTOR: Objection.

THE COURT: All right, approach for a moment.

(Bench conference)

PROSECUTOR: Your Honor, this motion has been litigated.

THE COURT: Right, how does this not [go] directly to the basis for the stop? You seem to be saying you don't pull everybody over, which doesn't make the

stop any less valid, and you seem to be trying to argue it's a pretext stop, right?

DEFENSE COUNSEL: No, Your Honor, I'm just asking questions to determine the facts, and the facts, even though the court has found the facts, the jury's entitled to make their own determination as to what the facts were. I'm not arguing that it's an illegal—

THE COURT: But then why are you asking him if he does or doesn't pull everybody over who's using cell phones?

DEFENSE COUNSEL: Your Honor, it goes to his credibility.

THE COURT: How?

DEFENSE COUNSEL: Because our position is that—that there was no cell phone.

THE COURT: Obviously you can—I want to make it clear you can obviously cross-examine on credibility and the credibility is obviously an issue in every case, but when you start asking about pulling other people over for using cell phones you seem to be implying that he was improperly pulling this defendant over, and I've already ruled it was proper. And you can go to questions about credibility, but motive for the stop, the pretext for the stop, and—and—and the legality of the stop have all been ruled on.

. . .

DEFENSE COUNSEL: I'm making the argument that the facts, the facts as stated by this officer that he saw the cell phone, that I'm challenging the credibility of the officer on that fact, and the other questions are designed not to challenge the legality of the stop but to challenge the credibility of the officer that that was the reason.

THE COURT: But it doesn't matter what the reason for the stop was, and you are trying to argue that it was pretext and—and harassment and dis-crimination, mentioning, for example in the opening about black males, which again has nothing to do with this case—and attempting to, I think, invoke the jury's sympathies or prejudices improperly, and—and again I think your opening was [a] very aggressive opening that—that to me crossed the line in several places about what you're permitted to argue. And you can argue that he never saw a cell phone and a cell phone was [not] recovered and therefore you should disbelieve him about the drugs. That's [a] credibility argument. But to start discussing whether he pulls everybody over or not, that only—that purely goes to the basis for the stop; you can't do that.

DEFENSE COUNSEL: It would be our position that that also goes to bias.

THE COURT: I disagree.

Appellant's counsel shifted to other subjects of cross-examination of Officer Heraud immediately following this bench conference. In his closing argument, however, counsel returned to appellant's defense theory that the officers used the hands-free violation as a pretextual basis for stopping appellant and searching him for drugs: "So we would submit to you, ladies and gentlemen, that the testimony of the police is not to be believed, that it's all manufactured, that the police are biased in this case against [appellant], that they're in this area, they're just looking for drugs, and they're looking for anybody that they can stop to try to show that they have drugs on them. And that they're manufacturing these cases, this case in particular."

## II.

Appellant claims that the trial court violated his Sixth Amendment right to conduct bias cross-examination of the

officers concerning their alleged pretextual motives in stopping him and what he contends was their selective enforcement of the hands-free law against black males. We are not persuaded.

## A.

■ The Confrontation Clause of the Sixth Amendment guarantees every criminal defendant the right to confront the witnesses against him through cross-examination. Cross-examination "is the principal means by which the believability of a witness and the truth of his testimony are tested," *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and the opportunity for meaningful cross-examination therefore "is critical for ensuring the integrity of the factfinding process," *Kentucky v. Stincer*, 482 U.S. 730, 736, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987).

■ In particular, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis*, 415 U.S. at 316, 94 S.Ct. 1105. Questions aimed at uncovering the " 'possible biases, prejudices, or ulterior motives of the witness' " thus are "[c]entral to" and " 'always a proper subject of cross-examination.' " *Jenkins v. United States*, 617 A.2d 529, 531 (D.C.1992) (quoting *Davis*, 415 U.S. at 316, 94 S.Ct. 1105; *Springer v. United States*, 388 A.2d 846, 855 (D.C. 1978)). "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.' " *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89

L.Ed.2d 674 (1986) (quoting *Davis*, 415 U.S. at 318, 94 S.Ct. 1105).

■■ Trial judges nevertheless retain wide latitude to impose reasonable limits on bias cross-examination so as to prevent "harassment, prejudice, confusion of the issues, or repetitive, cumulative, or only marginally relevant questioning." *Scull v. United States*, 564 A.2d 1161, 1164 (D.C. 1989); *see also Van Arsdall*, 475 U.S. at 679, 106 S.Ct. 1431. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). Indeed, we have observed that "[t]he inflammatory nature of racial bias is such that it requires careful shepherding in its presentation to the jury" and that "[t]rial court limitation of racial bias cross-examination may therefore be appropriate." *Moreno v. United States*, 482 A.2d 1233, 1238 (D.C.1984).

■ Moreover, a defendant (or any other party) who seeks to cross-examine a witness to establish bias must lay a proper foundation, "including a proffer of facts sufficient to enable the [trial] court 'to evaluate whether the proposed question is [in fact] probative of bias.' " *Howard v. United States*, 978 A.2d 1202, 1207 (D.C. 2009) (quoting *Jones v. United States*, 516 A.2d 513, 517 (D.C.1986)). "This requirement serves to prevent harassment of the witness, prejudice to the opposing party, confusion of the issues, and unnecessary waste of time; it [also] enables the [trial] judge to 'guard against the danger that counsel will ask highly prejudicial questions of witnesses with the almost certain knowledge that the insinuations are false.' " *McCraney v. United States*, 983 A.2d 1041, 1052 (D.C.2009) (quoting *Scull*, 564 A.2d at 1164).

The requisite proffer must contain "facts supporting a 'genuine belief' that the witness is biased" in the manner asserted, or at least "a 'well reasoned suspicion' rather than 'an improbable flight of fancy' to support the proposed cross-examination." *McCraney*, 983 A.2d at 1052 (quoting *Brown v. United States*, 683 A.2d 118, 124 (D.C.1996); *Scull*, 564 A.2d at 1164). This foundational requirement "is meant to be 'fairly lenient,'" *id.* (quoting *Carter v. United States*, 614 A.2d 913, 919 (D.C.1992)), and it must be applied flexibly, *Clayborne v. United States*, 751 A.2d 956, 963 (D.C.2000). "Especially in criminal cases, cross-examination is often genuinely exploratory rather than directly accusatory, for counsel often cannot know in advance what an opposing party's witness may have to say." *Id.* "It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop." *Alford v. United States*, 282 U.S. 687, 692, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *accord Best v. United States*, 328 A.2d 378, 382 n. 3 (D.C.1974). However, the foundational requirement is not intended to be "trivial," and "'[t]he more pointed and directly accusatory the examiner's question, the stricter the foundational requirement becomes.'" *McCraney*, 983 A.2d at 1052 (quoting *Clayborne*, 751 A.2d at 963).

### B.

Despite the trial court's statements at the bench that cross-examination on the issue of pretext would be precluded, the court permitted appellant to question Officer Glenn without limitation about the full range of the officers' motives in stopping appellant for the hands-free violation. The trial court also allowed appellant to ask enough questions of Officer Heraud to expose that officer's inconsistent enforcement of the hands-free law and to imply a pretextual purpose for the stop. Appellant thus had a meaningful opportunity on cross-examination to show that the officers' predominant interest was in making drug arrests and thereby to suggest to the jury that the officers' ulterior motives cast doubt on their credibility—and, in particular, on the accuracy and reliability of Officer Heraud's testimony that appellant dropped a bag to the ground as he turned a corner in the alley and that the bag of drugs the officer later found was the same bag appellant dropped during the chase.

The trial court's preclusion of additional cross-examination of Officer Heraud concerning the officers' alleged pretextual motives therefore is subject only to an abuse of discretion standard on appeal. *See Stack v. United States*, 519 A.2d 147, 151 (D.C.1986) ("Once a trial judge has allowed enough cross-examination on an appropriate issue to satisfy the Sixth Amendment, limitation on further cross-examination will be reviewed for an abuse of discretion."). Particularly in light of appellant's strong assertions, in both opening statement and closing argument, that the officers used the hands-free violation as a "manufactured" basis to stop him for the purpose of searching him for drugs, we are satisfied that the trial court's rulings did not prejudice appellant. We conclude, accordingly, that the trial court did not abuse its discretion even if it did act prematurely in foreclosing further questioning of Officer Heraud.[2] *See Johnson v. United States*, 398 A.2d 354, 367 (D.C.1979).

---

**2.** The trial court's pretrial determination that the officers' motives in stopping appellant for the hands-free violation were irrelevant to the lawfulness of the stop under the Fourth Amendment, although clearly correct under *Whren*, 517 U.S. at 811–13, 116 S.Ct. 1769, was not dispositive of the analytically distinct question, raised at trial, of the admissibility of

## C.

We have recognized ever since our decision in *Moreno v. United States,* 482 A.2d 1233, 1237–38 (D.C.1984), that a witness' racial animus or prejudice is a proper subject of bias cross-examination as long as the questions posed are relevant to the witness' credibility, supported by a sufficient factual proffer, and carefully tailored so as to limit their potentially inflammatory effect on the jury. "It is hard to conceive of a more 'prototypical form of bias' than racial bias." *Brinson v. Walker,* 547 F.3d 387, 393 (2d Cir.2008) (quoting *Van Arsdall,* 475 U.S. at 680, 106 S.Ct. 1431).

The selective enforcement of traffic laws on the basis of race is intentional discrimination and a clear manifestation of racial bias. "Stops based on race or ethnic appearance send the underlying message to all our citizens that those who are not white are judged by the color of their skin alone." *United States v. Montero–Camargo,* 208 F.3d 1122, 1135 (9th Cir.2000). *See Whren,* 517 U.S. at 813, 116 S.Ct. 1769 (selective enforcement of traffic laws on the basis of race violates the Equal Protection Clause); *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) ("purposeful discrimination" is an essential element of any Equal Protection claim).

It is nevertheless a close question whether the record here supported bias cross-examination of the officers concerning their alleged selective enforcement of the hands-free law on the basis of race. Appellant made no explicit factual proffer supporting a claim of racial bias, and the record established no more than that the officers were aware of appellant's race and stopped him even though Officer Heraud

bias cross-examination relating to those same

does not pull over every driver he observes violating the hands-free law.

Yet even if we assume for purposes of this discussion that appellant was entitled to ask some exploratory (and appropriately limited) questions on cross-examination aimed at determining whether the officers considered his race in deciding to stop him for the hands-free violation, appellant never posed such a question to any witness at trial, and in all of the discussions about pretext up at the bench his counsel never even suggested that he wished to do so. Although appellant stated repeatedly that he wanted to show the officers' bias, his only mention of race or racial bias was his counsel's reference in opening statement to the police "want[ing] to stop somebody, a black male driving a car, so that they can search for drugs."

That lone reference was insufficient to support a conclusion that the trial court precluded proper bias cross-examination aimed at establishing the officers' racial bias. It was not the trial court's duty to engage in speculation about the intended direction of appellant's bias cross-examination. To the contrary, once the government lodged its objection on the ground of relevance, appellant was obliged to give the trial court at least a basic outline of what he wished to ask the officers and to explain to the court how the officers' answers to his questions would establish the officers' bias. Appellant failed to meet this obligation, and we accordingly find no error. As the Ninth Circuit explained in *Harris v. United States,* 371 F.2d 365, 366 (9th Cir.1967) (quoting *United States v. Easterday,* 57 F.2d 165, 166 (2d Cir.1932) (L. Hand, J.)), "when a question is objected to as irrelevant, counsel conducting the inquiry should advise the court of the question's purpose. If he fails to do so, and the question is not 'inevitably and

motives. *See Howard,* 978 A.2d at 1205–08.

patently material,' the objection may be sustained without error,"

## III.

Appellant's other contentions warrant only brief discussion.

### A.

Appellant argues that the trial court erred by giving a non-standard jury instruction on flight that focused too heavily on the relationship between flight and feelings of guilt and failed to indicate that a variety of factors fully consistent with innocence can motivate a person to flee from the police.

The trial court instructed the jury as follows:

A person who flees or hides after a crime has been committed or after he has been accused of a crime may be motivated by a variety of factors. You may, for example, consider flight or concealment as a circumstance tending to show feelings of guilt, and you may consider feelings of guilt as tending to show actual guilt. On the other hand, flight or concealment does not create a presumption of guilt, nor does it necessarily reflect that the person has feelings of guilt. You may not, therefore, presume a defendant is guilty merely because he fled or concealed himself.

If you find evidence of flight or concealment, you should consider and weigh such evidence along with all the other evidence in the case and give it the weight you think it deserves.

Appellant asked the trial court to instruct the jury that the factors motivating a person's flight or concealment may be "fully consistent with innocence," as stated in the standard Red Book jury instruction in effect at the time of trial. The trial court declined appellant's request.

An instruction on flight must give the jury a full explanation of the variety of motives and feelings that might prompt a person to flee, *Austin v. United States,* 414 F.2d 1155, 1157–58 (D.C.Cir.1969). We thus have held that a flight instruction is "incomplete" if it fails to state that flight may be motivated by factors that are fully consistent with innocence. *Woody v. United States,* 369 A.2d 592, 594 (D.C.1977). The instruction given here did not satisfy these requirements, and it therefore was erroneous.

The error, however, was harmless. Appellant established on cross-examination of Officer Heraud that he was driving without a license at the time he was stopped, and he argued in closing that it was his lack of a driver's license, rather than his alleged possession of cocaine and marijuana, that caused him to run from the police. Given the strength of the government's evidence and the forcefulness with which appellant put his theory of innocent flight before the jury, we are "able to 'say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.' " *Hinton v. United States,* 979 A.2d 663, 690–91 (D.C.2009) (en banc) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

### B.

Appellant also complains that the trial court permitted the government to elicit an opinion from its drug expert on the ultimate issue of his intent to distribute. Relying exclusively on federal court decisions applying Rule 704(b) of the Federal Rules of Evidence, appellant contends that an expert witness may not "state an opinion or inference as to whether the defendant did or did not have the mental

state or condition constituting an element of the crime charged." Appellant did not raise this issue in the trial court, however, and we have long held that the local law of evidence in this jurisdiction does not prohibit expert witnesses from stating opinions on ultimate facts or issues to be resolved by the jury. *See, e.g., Wilkes v. United States,* 631 A.2d 880, 883 n. 7 (D.C. 1993); *Lampkins v. United States,* 401 A.2d 966, 970 (D.C.1979). Particularly in light of the absence of any substantial dispute at trial over appellant's intent to distribute, we are satisfied that the trial court did not commit plain error on this issue. *See United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *Davis v. United States,* 984 A.2d 1255, 1259 (D.C.2009).

### IV.

For the foregoing reasons, we conclude that appellant's convictions must be affirmed.

*So ordered.*