*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CF-778

KEITH A. MOORE, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-11041-11)

(Hon. Ann O'Regan Keary, Trial Judge)

(Argued September 25, 2014                    Decided April 30, 2015)

*Justin Murray*, Public Defender Service, with whom *James Klein*, *Samia Fam*, and *Shilpa S. Satoskar*, Public Defender Service, were on the briefs, for appellant.

*Patricia A. Heffernan*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, *Elizabeth Trosman*, *John P. Mannarino*, and *Holly Shick*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, GLICKMAN, *Associate Judge*, and PRYOR, *Senior Judge*.

Opinion for the court by *Associate Judge* GLICKMAN.

Dissenting opinion by *Senior Judge* PRYOR at page 30.

GLICKMAN, *Associate Judge*:  Appellant Keith Moore was convicted of robbing Lorenzo Thomas at gunpoint of over $1,000 in cash, and of other, related crimes.  The theory of Moore's defense at trial was that Thomas never had such a large sum in his possession and that he fabricated the robbery in a desperate ploy to forestall the imminent revocation of his probation on account of his inability to pay court-ordered restitution.  It therefore was important to the government's case to show that Thomas was not lying, and hence to explain how he came to possess over $1,000 in cash at the time of the alleged robbery.  In doing so, the government had an obstacle to overcome:  While Thomas testified at trial that the money allegedly stolen from him came from a tax refund and gambling proceeds, he previously had said otherwise and lied about the source of the funds.  For this and other reasons, Thomas's credibility was a central issue at trial.

Prior to trial, to confirm that he in fact had received a tax refund, Thomas gave his 2010 federal tax return to the prosecutor, who in turn provided it to Moore's defense counsel and the court.  In doing so, the prosecutor flagged the fact that Thomas had obtained a sizable tax credit and refund—over three thousand dollars—by claiming his twelve-year-old sister as his dependent.  The prosecutor stated that she had discussed this with Thomas before he testified in the grand jury, and that "there was no understanding between him [and] the government about

whether claiming his sister as a dependent was appropriate." Based on this disclosure and additional information indicating that Thomas was not entitled to the tax credit, Moore sought to cross-examine Thomas at trial about whether he had committed tax fraud—primarily in order to impeach Thomas's veracity and demonstrate that he was capable of fabricating the robbery in this case for a monetary gain, and secondarily to explore Thomas's motive to curry favor with the prosecution inasmuch as he had not been granted immunity from prosecution for tax fraud. However, the trial court, doubting that the inquiry would be probative of Thomas's veracity as a witness, and concerned that a digression into tax law would confuse the jury, precluded the proposed cross-examination in its entirety. On appeal, Moore contends that the court exercised its discretion erroneously in so ruling, and that we cannot deem the error harmless. We agree, and we therefore reverse Moore's convictions and remand for a new trial.

## I.

The alleged robbery occurred on June 12, 2011, and was described at trial by Thomas and his friend Dale Bolton.[1] That afternoon, they testified, they had been

---

[1] Bolton, who initially had claimed he was high on PCP and did not remember what had happened, was at trial a reluctant, hostile, and most unreliable

*(continued…)*

gambling at the home of "Little Tey." Thomas said he had arrived with a "couple hundred dollars" from his tax refund and some money from his mother, and that he won several hundred dollars, so that he had $1,066 by the time the gambling ended. Bolton, however, testified that Thomas had lost some money while gambling that afternoon, and was complaining about it.[2]

Upon leaving Little Tey's house, Thomas and Bolton joined Moore, Ronald Kent, and their friend Demario Kennedy, and the group decided to go in Kent's SUV to a liquor store where Thomas intended to purchase a $1,100 money order. This was a matter of some urgency for Thomas, because he was on probation in connection with his conviction in 2005 on four counts of armed robbery, and he needed the money order to make an overdue payment of restitution and avoid having his probation revoked at a violation hearing that happened to be scheduled the following day. On the way, the group stopped in the parking lot of the apartment complex where Moore's mother lived. Moore left the SUV to get his

---

*(continued…)*
witness whose testimony was riddled with inconsistencies. On cross-examination, he claimed he had tailored his testimony to what he understood the prosecutor wanted him to say because she had "threatened [him] with perjury."

[2] According to Bolton, Moore was present at Little Tey's house too, along with his friend Ronald Kent. Moore may or may not have been gambling there.

brother Darrell while Bolton went to buy marijuana and PCP. Thomas, who remained in the SUV, saw Moore hand his cell phone to Darrell.

The robbery allegedly took place when Moore returned to the SUV with his brother. Although their accounts differed as to the details, Thomas and Bolton testified that Moore pulled a gun on Thomas and, with his brother's assistance, robbed him of his money, wallet, and cell phone. Moore then directed Thomas to leave the area on foot, which he did. As Thomas departed, he saw Kent pull over in the SUV and pick up Moore.[3]

Thomas fled to a nearby church, where he summoned the police and reported that Moore and his brother had just robbed him with a silver handgun. After broadcasting a lookout for Kent's SUV, the officers and Thomas went to the parking lot where Thomas said the robbery took place. They found Thomas's wallet lying on the ground. Any money that had been in it was missing. Thomas and the officers then located Bolton, who had gone home, but he was unwilling to speak with them.

---

[3] Bolton testified that Moore proceeded to rob him as well, taking about $30 from his pockets. However, the jury acquitted Moore of robbing Bolton.

Meanwhile, not far away, other police officers spotted Kent's SUV and followed it. As they did so, one of the officers saw a handgun thrown out of the right rear passenger window of the SUV. The police later recovered a black handgun on the ground in that vicinity. When the police succeeded in stopping the SUV, they took its four occupants—Moore (who was sitting in the right rear passenger seat), his brother, Kent, and Kennedy—into custody. In separate showups, Thomas identified each of them. Moore, he stated, was the person who held the gun to his head while his brother went through his pockets. The police found $943 on Moore's person (all but $20 or $30 of it in his sock) and $61 on two of the other passengers.[4] From Moore's brother, the police took a blue Cricket cell phone, which Thomas identified as his.[5]

---

[4] In total, this was $62 less than Thomas claimed to have lost. The government argued that the "missing" $62 might have been spent to buy the two bottles of cold vodka and two bottles of cold beer that the police also found in the SUV.

[5] The parties disagreed at trial as to whether the evidence established that the cell phone really belonged to Thomas. The police allowed Thomas to keep the phone, and by the time of trial he said he no longer had it or remembered the phone's number. A detective testified that he allowed Thomas to have the phone because Thomas was able to unlock it by entering a code, but on cross-examination the detective appeared to acknowledge that he really did not know the phone was locked or what Thomas actually did to "unlock" it. The detective also did not know the number of the phone or whether that number was registered to Thomas.

Thomas subsequently was shown a photograph of the black handgun suspected of having been thrown from Kent's SUV. At first he said he did not recognize it and recalled that Moore's gun was a different color (silver). However, after continuing to examine the photo, Thomas noticed that the gun in the photo was a Colt. He stated that Moore's gun was a Colt and then declared that the gun in the photo was the gun Moore used to rob him. At trial, Thomas was shown the black handgun and identified it as the one Moore used, even though he earlier had said the weapon was silver. The defense challenged the credibility of this identification.[6]

In addition to the foregoing evidence, the prosecution introduced a recording of a telephone call Moore made to someone named Tracy three days after his arrest.[7] During the call, Moore told Tracy "I'm gonna go ahead and take this shit for everybody so them can come home," "I sit up all night crying about [Thomas] doing some shit like this," and "if it was anybody else," the police would not have been called, "and I wouldn't even be right here man." The government contended

---

[6] The defense also disputed whether this or any gun actually had been thrown from the SUV.

[7] The parties stipulated that Moore and Tracy both knew the call was being recorded. Evidently the call was made from the D.C. Jail.

that these statements amounted to inculpatory admissions, while the defense argued that Moore was merely expressing his anger at Thomas for falsely accusing him, his brother, and his friends of robbery.

The theory of Moore's defense at trial was that Thomas had fabricated the robbery in order to get from Moore the money he needed to fulfill his overdue restitution obligation at his probation violation hearing the following day, or at least to create an acceptable excuse for his inability to do so.[8]  One thing that lent some support to that theory, and that undercut Thomas's credibility, was his dishonesty and inconsistency as to the source of the cash that Moore purportedly stole from him.  When Thomas was interviewed by the police on June 12, and for several weeks afterward, he claimed to have earned most of the allegedly stolen $1,066 working as a server at P.F. Chang's (a restaurant), and that his mother had given him the rest.  But after the prosecutor contacted P.F. Chang's and learned that Thomas had stopped working there in January, Thomas admitted having lied about the source of the money.  He then told the prosecutor that much of the money actually came from his 2010 tax refund.  Later, and at trial, he said he won a lot of the money gambling at Little Tey's on the afternoon of the robbery.

---

[8]  As to Bolton, the defense theory was that he had echoed his friend Thomas's story of a robbery only to avoid being prosecuted for perjury.

Thomas explained that he had lied about the source of the money initially because he did not want to be "judged."[9]

Sometime before trial, Thomas provided his 2010 federal tax return to the prosecutor to confirm that he actually had received a tax refund as he had asserted. The prosecutor furnished a copy of the return to Moore's defense counsel and the court. In conjunction with that disclosure, the prosecutor highlighted the fact that Thomas had claimed his twelve-year-old sister as his dependent and, with respect to that fact, advised as follows:

> Mr. Thomas agreed that there was no understanding between him or [*sic*] the government about whether claiming his sister as a dependent was appropriate. Mr. Thomas also had an opportunity to speak to his lawyer ... about this matter. Detective Peter Shaw was also present when I discussed this issue with Mr. Thomas, and this discussion took place before Mr. Thomas testified in the grand jury. Mr. Thomas said his mother did not claim his sister as a dependent in 2010.

The tax return, which Thomas filed with the aid of a paid tax preparer, showed that Thomas's adjusted gross income ("AGI") for 2010 was $9,245 and that he was entitled to a federal tax refund of $4,387. This refund was entirely

---

[9] Thomas testified at trial pursuant to promises of immunity protecting him from prosecution for illegal gambling and lying about the source of his stolen money.

attributable to three credits,[10] the largest of which was an Earned Income Credit ("EIC") of $3,050.[11] According to the accompanying Paid Preparer's Earned Income Credit Checklist, Thomas claimed the EIC by representing (1) that his twelve-year-old sister E.T. lived with him and met the other criteria listed in the checklist for Thomas to claim her as his "qualifying child,"[12] *and* (2) that no one else was eligible to claim E.T. as his or her "qualifying child" under those criteria. The latter representation was crucial, because if more than one taxpayer could have claimed E.T. as a qualifying child, there were special "tiebreaker rules" (referenced in the EIC checklist) that determined who would have been allowed to do so. Those tiebreaker rules provide that if an individual's parents could claim her as a qualifying child but neither parent does so, "such individual may be claimed as the qualifying child of another taxpayer *but only if* the adjusted gross income of such

---

[10] Thomas had zero taxable income for 2010, so his refund equaled the sum of his tax credits.

[11] The other two credits were an Additional Child Tax Credit of $937 and a Making Work Pay Credit of $400. No issue has been raised about the propriety of these two credits. It would appear, however, that Thomas's entitlement to the Additional Child Tax Credit would be subject to the same question (whether Thomas could claim his sister as his "qualifying child") that appellant raises with respect to the EIC. *See* 26 U.S.C. § 24 (2014).

[12] A "qualifying child" is defined, essentially, as a son, daughter or sibling of the taxpayer (or a descendent of any such relative) who had "the same principal place of abode" as the taxpayer for more than half of the taxable year, and who meets certain age and other requirements. *See* 26 U.S.C. § 152 (c), (f) (2014).

taxpayer is higher than the highest adjusted gross income of any parent of the individual."[13] If the taxpayer's AGI is *not* higher than that of the child's parent, the taxpayer may not claim the child as his dependent even if the parent declines to do so. The representation that no one but Thomas could claim his sister as a qualifying child rendered it unnecessary for Thomas and the paid preparer to apply this tiebreaker rule in filling out the EIC checklist—and they did not do so.

Before trial, Moore's defense counsel informed the court that she intended to cross-examine Thomas about whether he had taken the earned income credit dishonestly, i.e., knowing he was not eligible for it, and about his discussions with the prosecutor concerning that issue. Counsel explained that she believed Thomas must have known he was not entitled to claim his sister as his dependent for purposes of the EIC because the sister (like Thomas himself) lived with their mother, Terria McCallister, and Ms. McCallister's adjusted gross income likely was greater than Thomas's paltry AGI because she was a federal government employee. Ms. McCallister therefore was entitled to claim Thomas's sister as her qualifying child and, counsel inferred, she had priority over Thomas under the

---

[13] 26 U.S.C. § 152 (c)(4)(C) (emphasis added).

tiebreaker rules.[14] Counsel acknowledged that the tax return had been prepared by a paid preparer rather than Thomas himself, but she pointed out that Thomas still had to provide the preparer with the necessary factual information, which Thomas evidently had "misrepresented" in some way.[15]

The prosecutor agreed with defense counsel's understanding that Thomas was entitled to claim his sister as his qualifying child only if his AGI was greater than that of his mother. After inquiring of Ms. McCallister as to why she had not claimed the EIC on her own return, the prosecutor reported that she said "she was present when … Thomas went to the accountant to prepare the [2010] tax returns last year, and that no one asked her whether she was employed"—though, in fact,

---

[14] Defense counsel did not point out the specific representation on the EIC checklist that no one other than Thomas could claim his sister as a qualifying child—a statement that seems to have been false, as it is undisputed that Thomas's mother could have done so. Rather, counsel surmised that the return preparer, applying the tiebreaker rule, might have asked Thomas, "does your mom work because [if] she makes more than you[,] [y]ou can't claim [the EIC]," and that Thomas might have lied and said his mother did not work.

[15] In filling out the Paid Preparer's Earned Income Credit Checklist, the preparer represented that he had completed it "based on information provided by the taxpayer" or otherwise "reasonably obtained," and that he did not know or have reason to know that the information used to determine the taxpayer's eligibility for the EIC was incorrect.

she was a federal government employee in 2010. The prosecutor did not say what, if anything, Ms. McCallister had said about her adjusted gross income in 2010.

Defense counsel argued that Moore was entitled to cross-examine Thomas about his possibly fraudulent tax return and his related discussions with the prosecutor for two reasons: (1) to impeach Thomas's credibility because his misrepresentations in his tax return were prior dishonest acts probative of his character for untruthfulness and hence his lack of veracity as a witness; and (2) to show that Thomas had a testimonial bias because his continuing exposure to prosecution or revocation of his probation on account of his alleged tax fraud provided him with a motive to curry favor with the prosecutor.[16] The prosecutor objected to the proposed cross-examination on the ground that it would "confuse the jury and leave them with the impression that [Thomas] had done something wrong when no one would be able to prove … what the correct interpretation of the tax law is."[17]

---

[16] The immunity from prosecution that Thomas was given did not extend to prosecution for tax fraud.

[17] The prosecutor previously had noted the "problem" that, in order to prove that Thomas claimed the EIC improperly, the defense might have to present extrinsic evidence in the form of testimony from Thomas's mother or a tax expert. Defense counsel agreed that she would be precluded from presenting such extrinsic evidence on the point, and that she would be stuck with Thomas's answers on

*(continued…)*

Ultimately, the trial court decided to preclude all cross-examination of Thomas relating to his allegedly falsified tax return. Observing that Thomas was "not a tax expert" and "not the person who prepared the tax form," the court reasoned that even if he had claimed the earned income credit dishonestly, "[t]his prior act ... would not be as relevant" as "many [other] areas for cross-examination" available to the defense in this case, "including [other] prior dishonesty of the witness." Additionally, after characterizing the issue of Thomas's right to claim the tax credit as "convoluted," "difficult to explain," and "a matter of interpretation of tax law," the court anticipated that the proposed cross-examination would "leave the jury with only the ability to speculate" as to whether "this is against the law," and would "distract[] [the jury] "from the really relevant issue, whether or not [Thomas is] truthful in his testimony."[18]

---

*(continued…)*
cross-examination, but she argued that Thomas might "tell the truth" and admit that he had made misrepresentations in his tax return. Furthermore, counsel argued, at the very least she should be allowed to cross-examine Thomas with respect to his bias by eliciting what the prosecutor said to him about his tax return before he testified in the grand jury.

[18] In focusing on whether the proposed cross-examination would be illuminative on the issue of Thomas's veracity, the court did not separately address whether it would be probative of his testimonial bias.

Thomas's credibility proved to be the central issue at trial. At the outset of her closing argument, the prosecutor acknowledged that "the real issue is whether or not you can believe Dale Bolton and Lorenzo Thomas." Thomas was much the more important of the two. Conceding that the jurors might not "like" Thomas in light of "some of the things that he did in his past," the prosecutor urged them to believe him because he "honestly [took] ownership" of his past misdeeds; "his story never changed, with the exception of the fact of where his money came from"; and the evidence corroborated his account of having been robbed of over a thousand dollars by Moore and his brother.

Moore's defense counsel, asserting that "[t]his case is about one man, Lorenzo Thomas," vigorously attacked him as "a witness who went from a supposed robbery victim to a lying, egotistical manipulator right before our very eyes." Counsel argued that Thomas fabricated his story of a robbery out of desperation, after "he lost all of his money" gambling, because he was facing imminent revocation of his probation and twelve years in prison and his "time was running out." Counsel disparaged the evidence that supposedly corroborated Thomas and emphasized that Thomas was contradicted or inconsistent on key points, including the source of the purportedly stolen money, whether he won or

lost money gambling at Little Tey's, and whether he truly recognized the handgun recovered by the police.

In rebuttal, the prosecutor challenged the defense characterization of Thomas as a "master manipulator" and insisted that "the only lie he told was where he got his money from. One lie." "[A]sk yourselves," the prosecutor exhorted the jury, "is he someone who is capable of manipulating this whole thing?" The jury found the case a difficult one. Its deliberations extended over four days, during which it requested the court to provide "more detailed explanation of beyond a reasonable doubt," reported itself "unable to come to agreement regarding the verdict," and declared that it was "hung on a number of matters." Ultimately, the jury found Moore guilty of Thomas's armed robbery but not guilty of Bolton's armed robbery.[19]

---

[19] Moore was tried together with his brother Darrell and Ronald Kent. It is possible that the jury's difficulties primarily related to them. The jury found Darrell Moore guilty only of misdemeanor receiving stolen property (that of Thomas). It found Kent guilty of being an accessory after the fact to assault with intent to commit robbery while armed.

**II.**

Moore contends the trial court abused its discretion when it precluded him from impeaching Thomas's veracity and showing his bias to curry favor with the prosecutor through cross-examination about his misrepresentations in his 2010 tax return and his confrontation with the prosecutor about those misrepresentations. The government argues that we should affirm the trial court because Moore did not proffer a sufficient factual foundation for the veracity and bias inquiries he sought to pursue, and that any error in foreclosing those inquiries was harmless in view of the strength of the prosecution case and the otherwise full opportunity Moore had to cross-examine Thomas. As the case has been presented to us, we therefore may determine whether Moore is entitled to a new trial by focusing primarily on two questions—whether he made an adequate proffer to justify embarking on his proposed cross-examination of Thomas and, if so, whether the court's preclusion of that cross-examination was nonetheless harmless. We conclude that Moore's proffer was sufficient for both desired areas of inquiry and that at least insofar as the interdiction of his attempt to impeach Thomas's veracity is concerned, we cannot deem the error harmless.[20]

---

[20] We therefore find it unnecessary to address Moore's contention (which the government disputes) that reversal is required because the court curtailed his cross-

*(continued…)*

**A.**

It is well settled that a sufficient factual predicate is a prerequisite to the two types of cross-examination Moore sought to undertake in this case. We have held that "[a] witness may be cross-examined on a prior bad act that has not resulted in a criminal conviction only where (1) the examiner has a factual predicate for the question, and (2) the bad act bears directly upon the veracity of the witness in respect to the issues involved in the trial."[21] We likewise have held that "[i]n order to pursue a line of cross-examination suggesting that a witness is biased, a defendant must lay 'a proper factual foundation.'"[22] The requirement of a factual

---

*(continued…)*
examination for a legally improper reason, to wit, that other available evidence of Thomas's lack of veracity and bias was "more relevant."

[21] *Murphy v. Bonanno*, 663 A.2d 505, 508-09 (D.C. 1995) (internal quotation marks and brackets omitted); *accord Bennett v. United States*, 763 A.2d 1117, 1122 (D.C. 2000). "[W]here such impeachment is permitted, evidence of the prior misconduct may be elicited only by cross-examination of the witness; it may not be proved by extrinsic evidence." *Sherer v. United States*, 470 A.2d 732, 738 (D.C. 1983).

[22] *McCraney v. United States*, 983 A.2d 1041, 1052 (D.C. 2009) (quoting *Scull v. United States*, 564 A.2d 1161, 1164 (D.C. 1989)).

predicate "serves to prevent harassment of the witness, prejudice to the opposing party, confusion of the issues, and unnecessary waste of time[.]"[23]

The trial court has discretion to determine whether a proffered factual predicate is sufficient, and the court properly exercises that discretion "by precluding cross-examination where the connection between the facts cited by defense counsel and the proposed line of questioning is too speculative to support the questions."[24] Nonetheless, the requirement of "a reasonable factual foundation" is a "fairly lenient one."[25] It simply calls for a "credible" good faith proffer of facts supporting a "genuine belief" or "well-reasoned suspicion" that the witness committed a veracity-impeaching bad act or is biased in the manner asserted; such a proffer, we have said, may be based on "plausible factual allegations or itself [may be] plausible within the framework of facts that neither party has contested."[26] The court has discretion in appropriate cases to test the

---

[23] *Id.*

[24] *Id.* (internal quotation marks and brackets omitted).

[25] *Clayborne v. United States*, 751 A.2d 956, 963 (D.C. 2000) (internal quotation marks omitted).

[26] *Scull*, 564 A.2d at 1164 & 1164 n.4 (internal quotation marks omitted); *see also McCraney*, 983 A.2d at 1052; *Grayton v. United States*, 745 A.2d 274, 280 (D.C. 2000). We note that appellant does not claim constitutional error in the

*(continued…)*

proffer, or allow the examiner to substantiate it, through a preliminary voir dire of the witness, which may be conducted outside the presence of the jury.[27]  Moreover, because "cross-examination is often genuinely exploratory rather than directly accusatory, [inasmuch as] counsel often cannot know in advance what an opposing party's witness may have to say," the foundational requirement is "flexible as well as lenient.  The more pointed and directly accusatory the examiner's question, the stricter the foundational requirement becomes, while a 'very slight' basis is enough to support 'nonaccusatory questions' on cross-examination."[28]

---

*(continued…)*
preclusion of his prior bad act cross-examination (as opposed to the preclusion of his cross-examination for bias).  "'[T]he confrontation clause mandates that the trial court give [the] defendant leave to cross-examine about [a] prior [false] claim only where it is 'shown convincingly' that the prior claim is false.'"  *Garibay v. United States*, 72 A.3d 133, 138 (D.C. 2013) (quoting *Roundtree v. United States*, 581 A.2d 315, 321 (D.C. 1990)).

[27] *See, e.g.*, *Garibay*, 72 A.3d at 139 (holding that where the factual proffer raised the possibility but did not show convincingly that the complainant previously had made a false allegation of sexual assault, the trial court should have permitted a "limited exploratory voir dire … to determine whether the witness fabricated an accusation"); *McCraney*, 983 A.2d at 1052 n.31 ("The judge clearly had the discretion to conduct a voir dire examination of Mascall outside the jury's presence as an aid to determining whether there might be grounds for the requested bias cross-examination.") (citing *Newman v. United States*, 705 A.2d 246, 259 (D.C. 1997)); *Roundtree*, 581 A.2d at 324.

[28] *Clayborne*, 751 A.2d at 963 (citation omitted); *see also Scull*, 564 A.2d at 1165 n.6 ("[A]n important purpose of cross-examination is exploration, and the trial court must give counsel some leeway to probe for information that she cannot prove before commencing cross-examination.").

Evaluated in accordance with these principles, Moore's proffer passed muster. As to whether Thomas took the $3,050 earned income credit in his 2010 federal tax return by dishonestly claiming his sister as his qualifying child, the proffer included the following facts and circumstances: First, the tax return was prepared by and with the assistance of a professional tax preparer. Second, the preparer made a factual inquiry of Thomas (memorialized in the preparer's checklist) to determine whether he satisfied the legal requirements for claiming his sister as his qualifying child. Third, Thomas and his sister both resided with their mother. Fourth, for that reason, their mother also met the initial criteria for claiming Thomas's sister as a qualifying child (as Thomas must have known). Fifth, under the "tiebreaker" rules, Thomas was permitted to claim his sister only if his adjusted gross income in 2010 exceeded his mother's AGI. Sixth, Thomas's AGI for the year was only $9,245.[29] Seventh, as Thomas also surely knew, his mother was a federal government employee in 2010 and her AGI therefore almost certainly exceeded his.[30] Eighth, Thomas therefore almost certainly was not entitled to claim his sister as his qualifying child. Ninth, in order to do so anyway,

---

[29] That was the figure shown on the tax return, which had been furnished to the court. Moore's defense counsel misspoke in argument and said Thomas's AGI was $9,400. The difference is immaterial.

[30] There was no reason to think otherwise. Moreover, the prosecutor, who was aware of the significance of the tiebreaker rule and had interviewed Ms.

*(continued…)*

he evidently misrepresented the facts in some way to convince the tax preparer that he could claim his sister as his qualifying child and take the EIC.[31]

Moreover, it was reasonable for defense counsel to conclude that if Thomas obtained his $3,050 tax credit (and tax refund) by this dishonest means, he committed an act of tax fraud.[32] Such an act of fraud would have been probative of Thomas's lack of truthfulness and, more particularly, his willingness to lie for financial gain. Thus, the proffer adequately identified a prior bad act that bore directly upon Thomas's veracity in respect to the central issue at trial, which was

---

*(continued…)*
McCallister about her failure to claim Thomas's sister as *her* qualifying child, did not claim that her AGI was less than Thomas's in 2010. If that were truly so, one would think the prosecutor would have trumpeted the fact as a decisive rebuttal of Moore's proffer.

[31] Indeed, as discussed above in footnote 14 and the accompanying text, a misrepresentation is apparent on the face of the preparer's checklist—to wit, that no one other than Thomas himself met the initial criteria for claiming his sister as a qualifying child. Because defense counsel did not mention this misrepresentation in her proffer (and no one ever pointed it out to the trial court), we do not consider it in evaluating the sufficiency of Moore's proffer. But we think counsel surely would have questioned Thomas about it had she been allowed to do so.

[32] *See generally* 26 U.S.C. §§ 7201 *et seq* (2014) (federal tax crimes); *e.g.* 26 U.S.C. § 7206 (2014) ("Any person who . . . willfully makes and subscribes any return. . . which contains or is verified by a written declaration that is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . shall be guilty of a felony[.]"); 26 U.S.C. § 7207 (2014) (misdemeanor fraudulent tax filings).

whether he fabricated his robbery accusation to obtain money from Moore dishonestly. The act therefore would have been a permissible subject of cross-examination to impeach Thomas's credibility.[33]

It is true, as the government argues, that the proffered facts and circumstances do not necessarily prove Thomas committed tax fraud. But they do, in our opinion, give rise to a quite reasonable suspicion that he did so. Defense counsel possibly could have confirmed that suspicion by questioning Thomas under oath about what he told the tax preparer and what he understood about his right to claim his sister as his qualifying child. At a minimum, the proffer was sufficient to entitle Moore to conduct a limited exploratory voir dire of Thomas in an effort to substantiate the suspicion that he had engaged in tax fraud. "It may

---

[33] *See Murphy v. Bonanno*, 663 A.2d 505, 509-510 (D.C. 1995) (holding that trial court erred in precluding, on relevance grounds, cross-examination of plaintiff in action for assault and battery and trespass about prior acts of bank fraud and insurance fraud, as such acts "would certainly be probative of whether [the plaintiff's] present allegations to which she testified at length were worthy of belief"); *see also Chnapkova v. Koh*, 985 F.2d 79, 82 (2d Cir. 1993) ("Evidence that a witness has made false statements in a tax return is obviously a matter which affects the witness's credibility."), *abrogated on other grounds*, *Jaffee v. Redmond*, 518 U.S. 1 (1996); *United States v. Sullivan*, 803 F.2d 87, 90-91 (3rd Cir. 1986) ("fraudulent replies" on witness's income tax forms held admissible to attack witness's credibility on cross-examination); *United States v. Zandi*, 769 F.2d 229, 236 (4th Cir. 1985) (stating that cross-examination of a witness about "false information" on his tax returns and other documents "bore on a relevant matter, i.e. his credibility, and was entirely appropriate").

seem unlikely that [Thomas] would admit to having [falsified his tax return], or that [he] would reveal information establishing convincingly that [he] did so, but appellant was entitled to find out."[34] It is by no means an "improbable flight of fancy"[35] to suppose that Thomas would have admitted having been dishonest in order to obtain a refund of a few thousand dollars, or that the jury would have disbelieved him if he had professed innocence without giving a persuasive explanation.

Moore also proffered adequate grounds to support his bias theory of cross-examination. In addition to the foregoing facts suggesting that Thomas dishonestly obtained a tax credit and refund to which he was not entitled, the court was informed that (1) the prosecutor doubted it was "appropriate" for Thomas to claim his sister as his dependent, (2) with a detective present, the prosecutor raised this issue with Thomas and his attorney just before Thomas testified in the grand jury, and (3) the immunity from prosecution that Thomas was granted did not protect him from prosecution for tax fraud. This was enough of a factual predicate for the defense to question Thomas about whether his fear of being prosecuted for tax

---

[34] *Garibay*, 72 A.3d at 139.

[35] *Scull*, 564 A.2d at 1164.

fraud (or having his probation revoked on account of it, or even having to face a civil tax inquiry) gave him a motive to curry favor with the prosecutor that colored and influenced his testimony at trial adversely to Moore.[36] Exposure of this motive, appellant suggests, would have helped explain why Thomas continued to "stand by his initial fabrication" even after he succeeded in avoiding the revocation of his probation on account of his failure to make restitution.[37]

Accordingly, to the extent the trial court precluded the proposed cross-examination of Thomas because it considered Moore's factual proffer inadequate, or the subject matter not probative of Thomas's veracity or bias, we conclude that the court erred.

The trial court was concerned that the cross-examination might be confusing and distracting to the jury, but it did not find that this danger so substantially outweighed the probative value of the proffered cross-examination as to warrant a

---

[36] *See id.* at 1165 ("In evaluating the possibility of bias in adverse testimony, the objective likelihood of prosecution and the subjective intent of the government to prosecute are irrelevant; rather, the witness' subjective belief in the possibility of prosecution is central, since it is this belief that can produce bias.").

[37] Brief for Appellant at 24.

total preclusion of the questioning under Rule 403.[38]  The record, in our view, would not have supported such a finding.  Straightforward questioning focused on whether Thomas made a knowing misrepresentation on his tax return, and on his discussion with the prosecutor concerning the propriety of his return, would not necessarily have posed a substantial risk of confusion, and there was no genuine dispute between the parties as to the material requirements of federal tax law.  The court therefore could have addressed its legitimate concerns by such measures as requiring a preliminary voir dire of Thomas, imposing reasonable limits on the scope and character of his questioning, and properly instructing the jury on its consideration of his testimony.[39]  "The court would, of course, have had ample authority and discretion to control the cross-examination to protect [Thomas] from harassment and to keep the questioning relevant and within reasonable bounds."[40]

---

[38] *See Johnson v. United States*, 683 A.2d 1087, 1099 (D.C. 1996) (en banc) (adopting Federal Rule of Evidence 403).

[39] *See, e.g.*, *Roundtree v. United States*, 581 A.2d at 323 (explaining that even where a defendant has made a sufficient factual proffer to justify cross-examination into a witness's prior bad acts or bias, the trial court still has "wide latitude to 'impose reasonable limits' on cross-examination 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'") (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)); *Scull*, 564 A.2d at 1165 ("Any potentiality of confusion to the jury may be eliminated by proper instructions.").

[40] *Garibay*, 72 A.3d at 139.

## B.

At least insofar as the defense was prevented from attempting to impeach Thomas's veracity with his putatively dishonest tax filing, we are not convinced that the erroneous ruling was harmless.[41] We address this issue applying "the customary harmless error standard" for non-constitutional error.[42] Under that standard, the burden is on the government to persuade us that "the judgment was not substantially swayed by the error," meaning it is "highly probable" the error did not affect the jury's verdict.[43] If the question of harmlessness is close enough

---

[41] Were the record sparser than it is, we might consider remanding for the trial court to conduct a limited voir dire of Thomas in order to ascertain whether cross-examination actually would have borne out the suspicion that he dishonestly claimed his sister as his dependent. *See Shorter v. United States*, 792 A.2d 228, 236 (D.C. 2001) (holding that where trial court erred in preventing defendant from examining complainant about a prior allegation of sexual abuse, a remand was appropriate for the court to conduct a limited voir dire of the complainant in order to determine whether the allegation was in fact false); *Garibay*, 72 A.3d at 140 (same). If not, then we might find it easy to deem the error harmless. However, because we have discerned that Thomas's tax return reveals on its face an apparent material misrepresentation (the denial that anyone else, i.e., his mother, could have claimed his sister as a qualifying child), we do not consider such a step necessary or appropriate here. The existence of that apparent misrepresentation is sufficient by itself to establish that the requested cross-examination might have been successful in demonstrating Thomas's dishonesty to the jury.

[42] *Bennett v. United States*, 763 A.2d 1117, 1125 & n.10 (D.C. 2000).

[43] *In re L.C.*, 92 A.3d 290, 299-300 (D.C. 2014) (quoting *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)).

that the court finds itself "in virtual equipoise …, the court should treat the error … as if it affected the verdict."[44]

Harmlessness is a close question here, as the government's case against Moore was not a weak one, but it did depend crucially on the testimony and credibility of Thomas.  Although Bolton also testified that Moore robbed Thomas, Bolton simply was not a credible accuser.  To be sure, Thomas's account of the robbery was corroborated, and not just by Bolton; the jury readily could have found that Thomas was corroborated not only by the physical evidence found on Moore and at the scene of the alleged robbery, but as well by Moore's own statements in his recorded phone call to Tracy.  But Thomas also was contradicted or inconsistent on important matters, including the source of his allegedly stolen money, whether he actually won or lost money gambling with Little Tey, and the color of the gun Moore allegedly used to rob him.  Moreover, Thomas was impeached with his past convictions, which included one for conspiracy to commit credit card fraud, and the jury was informed that at the time of trial he had pending charges for credit card theft and fraud.  Impeachment of Thomas's truthfulness by showing that he had defrauded the federal government with his tax return could

---

[44] *Hinton v. United States*, 979 A.2d 663, 691 (D.C. 2009) (en banc) (quoting *Fry v. Pliler*, 551 U.S. 112, 121 n.3 (2007)).

have supported the defense theory that Thomas lied about the robbery to get money to pay his debts; it was plausible Thomas knew Moore had a large amount of cash on him (perhaps because they both had been at Little Tey's and Moore had been gambling too). As Moore argues on appeal, the additional impeachment, if successful,[45] would have impeded the prosecutor from arguing to the jury that Thomas was an honest witness who had told only "one lie" and who was not manipulative enough to concoct a false story about having been robbed. In this vigorously litigated and argued case, the additional reason to be skeptical of Thomas might have been enough to tip the balance for the jury and cause it to entertain a reasonable doubt of Moore's guilt.[46]

As we cannot deem the error harmless, we must reverse Moore's convictions and remand his case for a new trial.[47]

---

[45] In evaluating harmlessness we must "assum[e] that the damaging potential of the cross-examination [would have been] fully realized." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

[46] As we are unable to conclude that the error in preventing Moore from attempting to impeach Thomas's veracity with his tax return was harmless, we find it unnecessary to consider whether the exclusion of the proposed bias cross-examination was harmless as well.

[47] The government argues that reversal of Moore's convictions for unlawful possession of a firearm and carrying a pistol without a license would be unwarranted in any event, because the police testimony provided "compelling,

*(continued…)*

*So ordered.*


PRYOR, *Senior Judge*, dissenting:  This case presents evidentiary questions involving an application of long-standing trial concepts.  The details of the alleged, armed robbery have been fully set forth in the majority opinion.  At trial the primary testimony of the complaining witness, as well as, the cross-examination of him informed the jury of the context of gambling and drugs, which surrounded the incident.  The judge declined to allow cross-examination of the complainant on the subject of his recent tax return for the purpose of testing his truthfulness and veracity.  The primary issues in this appeal stem from that ruling.


While the jury's primary role at trial is to be the factfinder, the settled case law allows the cross-examiner to test the truthfulness and bias of the witness by engaging the person on collateral subjects.  The trial judge, in an effort to strike a balance between evaluating credibility and relevance to the ultimate question, is

---

*(continued…)*

independent evidence" of Moore's guilt on those charges.  We do not agree.  An officer testified to having seen someone toss a gun out the rear passenger window of Kent's SUV, next to which Moore was sitting, and a gun was found in the area.  But if the jury had been persuaded to doubt Thomas's testimony that Moore had a gun and used it to rob him moments earlier, we think the jury reasonably might have hesitated to convict Moore of the weapons charges based on what remained of the government's case.

authorized to use discretion in imposing limits on such cross-examination. Although cross-examination was permitted as to some collateral behavior of the witness, it was precluded entirely as to tax questions. The judge concluded that such questioning could only lead to jury speculation and also raise questions of self-incrimination of the witness. In resolving this issue, I am mindful of the Federal Rules of Evidence, Rule 403, which provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusing issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Bearing in mind Rule 403 and the exercise of discretion entrusted to the trial judge, I conclude there was no error on this question. But understanding that appellant's primary defense was to challenge the complainant's veracity, it would appear that even if the exclusion of questions bearing on taxes was error, it was harmless error. Thus the error must have had a substantial effect on the verdict. *Kotteakos v. United States*, 328 U.S. 750 (1946); *see also Bennett v. United States*, 763 A.2d 1117 (D.C. 2000) (This kind of error to be evaluated under *Kotteakos*). Lastly, I would clearly affirm the firearm violation.